**Mark PIQUARD and Jerome Duran, Plaintiffs,**

v.

**CITY OF EAST PEORIA, a Corporation, and the Board of Trustees of the City of East Peoria Police Pension Fund, Defendants.**

**No. 94–1130.**

United States District Court, C.D. Illinois, Peoria Division.

April 28, 1995.

Patricia C. Benassi, Benassi & Benassi, Peoria, IL, for plaintiffs.

Thomas R. Davis and Patrick A. Murphey, Miller, Hall & Triggs, Peoria, IL, for defendant City of East Peoria.

James L. Dobrovolny, Urbana, IL, for defendant Bd. of Trustees of City of East Peoria Police Pension Fund.

## ORDER

MIHM, Chief Judge.

This matter is before the Court on the City of East Peoria's ("City") Motion to Dismiss (# 10), the Board of Trustees of the City of East Peoria Police Pension Fund's ("Board") Motion to Dismiss (# 11), Plaintiffs' Motion for Summary Judgment (# 18), the City's Motion to Strike Affidavit of Jerome Duran (# 25), the City's Motion to Strike Affidavit of Mark Piquard (# 26), Plaintiffs' Combined

Motion and Memorandum in Support of Motion to Strike Portions of Affidavit of Donald Stoner (# 38), Plaintiffs' Motion to Strike City of East Peoria's Response to Plaintiffs' Combined Motion and Memorandum in Support of Motion to Strike Portions of Affidavit of Donald Stoner (# 41), the City's Motion to Dismiss Count IV of Complaint (# 45), and the Board's Motion to Dismiss Count IV of Complaint (# 47).

For the reasons stated below, the City's Motion to Dismiss (# 10) is DENIED, the Board's Motion to Dismiss (# 11) is DENIED, Plaintiffs' Motion for Summary Judgment is GRANTED IN PART and DENIED WITHOUT PREJUDICE IN PART, the City's Motions to Strike Affidavits of Jerome Duran and Mark Piquard (# 25 and # 26) are GRANTED IN PART and DENIED IN PART, Plaintiffs' Motion to Strike Portions of Affidavit of Donald Stoner (# 38) is DENIED, Plaintiffs' Motion to Strike the City's Response to Plaintiffs' Motion to Strike Portions of Affidavit of Donald Stoner (# 41) is GRANTED, the City's Motion to Dismiss Count IV (# 45) is DENIED, and the Board's Motion to Dismiss Count IV (# 47) is DENIED.

### Motions to Dismiss (# 10, # 11, # 45, and # 47)

■ Counts I and II allege violations of Title II of the Americans with Disabilities Act ("ADA") against the Board and the City respectively, Count III asserts an identical claim under Section 504 of the Vocational Rehabilitation Act, 29 U.S.C. § 794, against the City, and Count IV alleges violations of Title I of the ADA against the City and the Board. The Board has moved to dismiss Count I of Plaintiffs' Complaint pursuant to Fed.R.Civ.P. 12(b)(6). The City has moved to dismiss Counts II and III of the Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and/or (6). Both the City and the Board have moved to dismiss Count IV of the Complaint pursuant to Rules 12(b)(1), 12(b)(6),

and 12(b)(7). When considering a motion to dismiss, the Court accepts the factual allegations of the complaint as true and draws all reasonable inferences from the allegations in the plaintiff's favor. *Wiemerslage v. Maine Tp. High School Dist. 207,* 29 F.3d 1149, 1151 (7th Cir.1994). A motion to dismiss will only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

The following facts are taken as true. Mark Piquard ("Piquard") has been employed as a police officer by the City since 1990 and is being denied the opportunity to participate in the City's Police Pension Fund solely because of his spondylolisthesis. Jerome Duran ("Duran") has been employed as a police officer by the City since 1967 and is being denied the opportunity to participate in the City's Pension Fund solely because of an astigmatism. On April 29, 1990, the Board originally denied Piquard's application for membership in the City of East Peoria's Police Pension Fund ("Fund"). The Board denied Duran's application for admission to the Fund in 1967 or 1968. On August 16, 1993, Piquard reapplied for admission into the Fund, and his application was denied on August 20, 1993. Duran reapplied on January 28, 1994, and the Board has failed to respond to that application. Piquard filed a charge of discrimination alleging a violation of Title I of the ADA with the EEOC on December 23, 1993. Duran filed his Title I charge with the EEOC on February 22, 1994.

■ Defendants argue that Counts I, II, and III are barred by the applicable statute of limitations. The limitations period for claims under Section 504 and Titles I and II of the ADA is two years. *Cheeney v. Highland Community College,* 15 F.3d 79, 82 (7th Cir.1994) (Rehabilitation Act); *Bush v. Commonwealth Edison Co.,* 990 F.2d 928, 933 (7th Cir.1993) (Rehabilitation Act).[1] Plain-

---

**1.** Plaintiffs argue that the two-year statute of limitations period for ADA and Section 504 claims is incorrect and that the correct statute of limitations for Plaintiffs' claims is five years. The Court rejects this argument as inconsistent with the law of the Seventh Circuit. When a

federal civil rights law does not contain a statute of limitations, courts should borrow the statute of limitations from state statutes governing personal injury suits. *Cheeney,* 15 F.3d at 81; *Bush,* 990 F.2d at 933. The Seventh Circuit has held that Illinois' two-year statute of limitations appli-

tiffs' Complaint was filed on March 10, 1994, and the denials of their first applications occurred more than two years before that date. Defendants also argue that the discriminatory acts complained of occurred before the Acts' effective dates and that the Acts are not to be applied retroactively. The initial denials of Plaintiffs' applications predate January 26, 1992, the effective date of Titles I and II of the ADA. Duran's denial also predates the enactment of Section 504 in 1973. Defendants further argue that Plaintiffs' Title I charges were not timely filed with the EEOC. Under the ADA, an EEOC charge must be filed by the aggrieved party within 180 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e–5(e)(1).

Plaintiffs do not and cannot dispute that the ADA may not be applied retroactively. *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 545 (7th Cir.1995). Instead, they contend that Defendants violate the ADA every day they are employed and not provided benefits because of their disabilities. Specifically, Plaintiffs allege that Defendants' conduct constitutes "systemic" and "serial" violations of the ADA. Plaintiffs also contend that the Board violated the ADA when it denied Plaintiffs' second applications to the Fund dated August, 1993 and January, 1994.

■■■ "The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir.1992). The Seventh Circuit has discussed three viable continuing violation theories, only two of which are alleged here. *Jones v. Merchants Nat. Bank & Trust Co. of Indianapolis*, 42

F.3d 1054, 1057–58 (7th Cir.1994); *Selan,* 969 F.2d at 565. The "systemic" continuing violation theory involves an employer's express, openly espoused policy that is alleged to be discriminatory. *Selan,* 969 F.2d at 565 & n. 5; *see also Mack v. Great Atlantic and Pacific Tea Co., Inc.,* 871 F.2d 179, 185 (1st Cir.1989). A "serial" continuing violation occurs when an employer covertly follows a practice of discrimination over a period of time. In such a case, the plaintiff can only realize that he/she is a victim of discrimination after a series of discrete acts has occurred. The limitations period begins to run when the plaintiff gains such insight. *Jones,* 42 F.3d at 1058; *Selan,* 969 F.2d at 565.[2]

Plaintiffs argue that Defendants' conduct constitutes a systemic continuing violation because Defendants are responsible for discriminatory practices and policies that treat similarly situated employees differently based on disabilities (e.g., allowing persons without disabilities to participate in the Fund but denying participation in the Fund to persons with disabilities). In *Bazemore v. Friday,* 478 U.S. 385, 395, 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986), the Supreme Court considered discriminatory salary disparities created prior to Title VII's effective date and perpetuated thereafter. The Court held that each week's paycheck that delivered less to a black employee than a similarly situated white employee was a wrong actionable under Title VII, regardless of the fact that the discriminatory pattern began prior to the effective date of Title VII. *Id.*

A pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet been become effective, became a violation upon Title VII's effective date, and to the extent

cable to personal injury suits is the most appropriate statute of limitations to borrow for Section 504 of the Rehabilitation Act of 1973. *Id.* "This is important because of the relationship between the Rehabilitation Act and Title II. The Rehabilitation Act's coverage was nearly identical to Title II, except it only applied to entities receiving federal funding." *Doe v. County of Milwaukee,* 871 F.Supp. 1072, 1078 (E.D.Wis.1995). Thus, the most applicable Illinois statute of limitations for ADA claims is the two-year one applicable to personal injury suits which has been applied to Section 504 claims.

2. The serial continuing violation theory is inapplicable here. The Complaint alleges that Plaintiffs were rejected as participants in the Fund because of their spondylolisthesis and astigmatism. The Complaint does not allege that the Board's reasons for denying their applications were concealed from them and that they did not reasonably believe they were victims of discrimination until a discriminatory pattern of conduct occurred.

an employer continued to engage in that act or practice, it is liable under that statute. While recovery may not be permitted for pre–1972 acts of discrimination, to the extent that this discrimination was perpetuated after 1972, liability may be imposed. *Id.*

The Seventh Circuit has held that active employees may challenge a discriminatory retirement plan. In *Bartmess v. Drewrys U.S.A., Inc.*, 444 F.2d 1186 (7th Cir.1971), a female employee challenged a retirement plan which treated men and women differently with respect to retirement ages. The defendant argued that the only potentially unlawful practice under a retirement plan is the actual discharge and not the overall maintenance of the plan and thus, plaintiff should have waited until the actual date of her retirement before filing a charge with the EEOC. The Seventh Circuit disagreed and allowed the plaintiff to proceed. The *Bartmess* court stated:

> We have no difficulty in concluding that the actual maintenance of a discriminatory retirement plan can be one of the acts which "adversely affect [an individual's] status as an employee, because of such individual's sex" and that retirement plan should be viewed as "conditions of employment" within the meaning of Section 703 of Title VII. (42 U.S.C. 2000e–2(a)).

> The collective bargaining agreement in force at the time plaintiff filed her charge provided that female employees must retire three years prior to their male counterparts. If such a contract is found to be discriminatory, its mere presence in a collective bargaining agreement would render female workers "aggrieved persons" within the meaning of Title VII and would continue to do so for the entire time the individual was employed.

*Id.* at 1188. Finally, the Seventh Circuit has stated that, "[o]rdinarily in the case of a continuing unlawful practice, every day that the practice continues is a fresh wrong for purposes of the statute of limitations." *Webb v. Indiana Nat. Bank*, 931 F.2d 434, 438 (7th Cir.1991).

Plaintiffs allege that the Board, in determining who may participate in the Fund, uses eligibility criteria and methods of administration which discriminate against qualified individuals with disabilities, such as Plaintiffs. Plaintiffs further allege that the Board has imposed eligibility criteria for participation in the Fund which screen out or tend to screen out individuals with disabilities, such as Plaintiffs, from fully enjoying the services and benefits of the Fund and that those criteria are not necessary to the administration of the Fund. Plaintiffs claim that the Board has failed to make reasonable modification of its policies, practices, and procedures which it uses to determine eligibility for admission into the Fund to avoid discriminating against individuals with disabilities, including Plaintiffs. Plaintiffs also allege that the City uses discriminatory eligibility criteria and methods of administering pension benefits which screen out individuals with disabilities from enjoying such benefits.

Having alleged that Defendants' illegal policies and practices of denying disabled individuals admission into the Fund continued from the initial denials of Plaintiffs' applications to their reapplications in August, 1993 and January, 1994, and into the present, Plaintiffs have filed timely EEOC charges under Title I and a timely Complaint under the ADA and Section 504 of the Rehabilitation Act. *Mack*, 871 F.2d at 183 (systemic violation requires discriminatory policy to be in effect during statute of limitations period); *Stewart v. CPC Intern., Inc.*, 679 F.2d 117, 121 (7th Cir.1982) (systemic violation exists when challenged policy in place and applicable to plaintiff at the time discrimination charge was filed).

Defendants rely heavily on the Sixth Circuit's decision in *Dixon v. Anderson*, 928 F.2d 212 (6th Cir.1991), in which the plaintiffs asserted a new violation occurred daily under the Fourteenth Amendment's equal protection clause when similarly situated colleagues enjoyed membership in the retirement system and had contributions withheld from their checks, while plaintiffs were denied similar rights. The *Dixon* court rejected plaintiffs' argument and held that their employer's failure to withhold contributions was just a reminder of their nonmember status. The *Dixon* court cited to *United Air*

*Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), and found that plaintiffs only suffered from the continuing effects of past discrimination and were not the victims of a continuing violation. *Id.* at 216–17. According to the *Dixon* court, once the division into members and nonmembers was made according to statute, the retirement system operated neutrally in that all members were treated equally and all nonmembers were treated equally. *Id.* The *Dixon* court further held that although the defendants followed a policy of discrimination in membership selection, no allegedly discriminatory act occurred within the two-year limitations period prior to the filing of their complaint. *Id.* at 218.[3] The limitations period for plaintiffs' cause of action was held to have begun when they learned of their classification as nonmembers before the limitations period and there were no later triggering events. *Id.* at 217.

In *Evans,* a stewardess was fired as a result of a discriminatory "no-marriage" policy. *Evans,* 431 U.S. 553, 97 S.Ct. 1885 (1977). The airline later rehired the stewardess but refused to reinstate her seniority. The Supreme Court held that the limitations period ran from the time of the decision to fire her and that the implementation of that decision in another employment action was not a separate discriminatory act. Thus, the employer's refusal to grant retroactive seniority to the rehired stewardess was not a Title VII violation when she had failed to file a timely charge with the EEOC at the time of her discharge. The Court stated that "the critical question is whether any present violation exists" and that "[a] discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed." *Id.* at 558, 97 S.Ct. at 1889. *Evans* held that the neutral seniority system which merely perpetuated the effects of previous discrimination was not a continuing violation. *Id.* at 560–61, 97 S.Ct. at 1890.

*Evans* is distinguishable because it dealt with a one-time violation, a discriminatory discharge, which had a lingering effect only because of a neutral seniority system. The case at bar, however, involves allegations by current employees of a long-standing policy of discrimination against disabled employees which continues after the ADA's effective date and into the limitations period. Plaintiffs attack what they argue are presently maintained discriminatory eligibility criteria and methods of administering the Fund applicable to Plaintiffs and other officers with disabilities.

In *Stewart,* the Seventh Circuit found that *Evans,* "with its emphasis upon proving a 'present violation,' appear[ed] to reinforce rather than weaken the viability of the *Bartmess* continuing-violation theory, since the challenged [retirement] policy was in place and unquestionably was applicable to the plaintiff at the time the discrimination charge was filed." *Stewart,* 679 F.2d at 121. *Dixon's* holding that a denial of retirement benefits, allegedly because of a discriminatory policy still in effect and applicable to the plaintiffs, constitutes merely the lingering effects of a past discriminatory act, as in *Evans,* seems inconsistent with the law of the Seventh Circuit.

The parties disagree over whether Illinois law allows a reapplication for admission into the Fund and whether the Fund's failure to allow Plaintiffs admission into the Fund based on their subsequent applications or requests for rehearing after the ADA's effective date constitute discriminatory acts. Defendants argue that Plaintiffs' second applications for admission attempt to resurrect final decisions denying them participation in the Fund made before the limitations period and the ADA's effective date. Defendants contend that Plaintiffs should not be allowed to avoid the statute of limitations and the non-retroactivity of the ADA by reapplying

---

**3.** This case is distinguishable because alleged discriminatory acts took place within the two-year limitations period when Plaintiffs were not granted admission into the Fund based on their second applications in August, 1993 and January, 1994. *See infra.* In *Dixon,* the statutory scheme did not provide for requests for reevaluations of

any employee's eligibility for membership after rejection. *Id.* at 217. Thus, the court believed that the civil rights violations occurred only once, when the plaintiffs were denied membership. *Dixon* did not, however, consider, the effect of a later-enacted federal statute on reapplications by current employees.

**1116**

for admission. According to Defendants, "Any other holding would mean that a plaintiff could always resuscitate a stale claim by asking for reconsideration." *Dugan v. Ball State University*, 815 F.2d 1132, 1135 (7th Cir.1987).

In *Dugan*, the plaintiff was denied a promotion and failed to file a charge with the EEOC within 300 days of the Board of Trustees' affirmance of the denial. The defendant argued that her claim was barred by the applicable statute of limitations. The plaintiff responded that her later submission of a letter to the Dean should be considered a new application for promotion and that the time for filing a claim with the EEOC should be measured from the Dean's subsequent letter informing her that she could not be promoted to associate professor without a doctorate. The court rejected the plaintiff's claim that the Dean's letter constituted a separate denial because nothing in the record suggested that either the plaintiff or the Dean viewed her letter as beginning the application process again. For example, Dugan did not appeal the Dean's decision, and recommendations for promotion were normally initiated by the department, not by application directed to the Dean of the college. *Id.*

The *Dugan* plaintiff sought to avoid application of the Supreme Court's decision in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). *Dugan*, 815 F.2d at 1135. In *Ricks*, a faculty member alleged that he was discriminatorily denied tenure, a decision which at Delaware State College inevitably led to his termination. Ricks challenged only the decision denying him tenure, but by arguing the date of termination as the time when the statute of limitations began to run, the Court found that "[i]n effect, he is claiming a 'continuing violation.'" *Ricks*, 449 U.S. at 257, 101 S.Ct. at 503. The Supreme Court held that the limitations period ran not from when he was terminated, but from when he was notified of the decision to deny him tenure. *Ricks*, 449 U.S. at 259, 101 S.Ct. at 504–05.

■ *Dugan* and *Ricks* are inapplicable to this case. Plaintiffs' Complaint suggests that they viewed their second applications for admission into the Fund as beginning the application process again in view of the newly-enacted ADA. As in *Bazemore*, a pattern or practice of discriminating against disabled individuals in determining admission into the Fund became a violation of the ADA on its effective date.[4] Thus, it was not "obviously futile" for Plaintiffs to reapply for admission into the Fund after the ADA's effective date. *Webb*, 931 F.2d at 437 ("[I]f it obviously would be futile to make a future application for the job of which he has just been turned down, the plaintiff cannot delay suit and use those futile applications to delay the running of the statutory period indefinitely."). Moreover, unlike *Ricks*, where the plaintiff could have filed an action as of the date he was notified of the denial of tenure, the original acts of discrimination here could not have been challenged when committed because the ADA and, with regard to Duran the Rehabilitation Act, were not yet enacted. Defendants' failure to allow Plaintiffs admission into the Fund after their second applications, if based on their alleged disabilities and in violation of the ADA, would constitute an additional discriminatory act within the limitations period. *Dixon*, 928 F.2d at 221 (dissenting opinion).

■ Moreover, this case looks more like the *Bazemore* series of wrongful acts than the *Evans* and *Ricks* terminations in which the employers took one dispositive act. Like the employer that applies different salary schedules to black and white employees and commits a new wrong every pay period, Defendants commit a new wrong every pay period Fund contributions are not withheld from disabled employees' checks. "[E]ach day [Piquard and Duran] are treated differently than other similarly situated employees, with respect to their pension benefits, is another violation." *Dixon*, 928 F.2d at 220 (dissenting opinion). "Plaintiffs ... are continually denied the right to participate in a pension plan pursuant to an ongoing policy which is still in effect." *Id.*

---

**4.** *See infra* pp. 1123–24 for discussion of legislative history indicating that Congress did not intend to grandfather in pre-ADA discriminatory benefit plan practices.

In a similar case, another Illinois district court has found that Section 5/3–106 of the Illinois Pension Code does not prevent the Board from rehearing second applications for admission in the Fund after the ADA's effective date, *Holmes v. City of Aurora*, 1995 WL 21606, *4 (N.D.Ill. Jan. 18, 1995), but whether state law allows reapplications for admission is not controlling here. If the original denials of Plaintiffs' applications occurred after the ADA's effective date and Illinois law clearly barred second applications for admission, that would be evidence that reapplications would be futile and that the parties did not view Plaintiffs' subsequent applications as beginning the process anew. That situation did not occur here. After its effective date, Defendants were under a duty to comply with the ADA. They are free to claim that state law prevents them from reviewing subsequent applications for admission to the Fund, but that is no defense to a failure to comply with the Act after its effective date. If Defendants are denying Plaintiffs admission into the Fund after the effective date of the ADA and in violation of the ADA, that conduct is illegal, regardless of whether state law allows reapplications.

Finally, Defendants rely on *Florida v. Long*, 487 U.S. 223, 108 S.Ct. 2354, 101 L.Ed.2d 206 (1988), to support their argument that Plaintiffs' action is retroactive and that *Bazemore* is inapplicable in the pension fund context. In *Long*, the Supreme Court stated:

> It is not correct to consider payment of benefits based on a retirement that has already occurred as a sort of continuing violation. Our decision in *Bazemore v. Friday*, 478 U.S. 385 [106 S.Ct. 3000, 92 L.Ed.2d 315] (1986), is not to the contrary. *Bazemore* concerned the continuing payment of discriminatory wages.... In a salary case, however, each week's paycheck is compensation for work presently performed and completed by an employee. Further, the employer does not fund its payroll on an actuarial basis. By contrast, a pension plan, funded on an actuarial basis, provides benefits fixed under a contract between the employer and retiree based on a past assessment of an employee's expected years of service, date of retirement, average final salary, and years of projected benefits. In the pension fund context, a continuing violation principle in every case would render employers liable for all past conduct, regardless of whether the liability principle was first announced by [*Los Angeles, Dept. of Water and Power v.*] *Manhart* [435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657] (1978), [*Arizona Governing Committee for Tax Deferred Annuity & Deferred Compensation Plans v.*] *Norris* [463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236] (1983) or our decision here. We cannot recognize a principle of equitable relief that ignores the essential assumptions of an actuarially funded pension plan.... It is essentially retroactive to disrupt past pension funding assumptions by requiring further adjustments based on conduct that could not reasonably have been considered violative of Title VII at the time retirements occurred and funding provisions were made.

*Florida v. Long*, 487 U.S. 223, 239–40, 108 S.Ct. 2354, 2364, 101 L.Ed.2d 206 (1988). *Long* involved only persons who had already retired prior to a change in the law and whether they could sue to adjust their benefits. The Supreme Court held that due to the problem which would be caused by pensions that were already funded on an actuarial basis, retirees could not sue. *Long* did not address a discriminatory exclusion of current employees from accruing benefits and even explicitly left open the possibility that a retiree may sue where the retirement benefit amount is not fixed by contract. *Id.* at 240, 108 S.Ct. at 2364.

Although Plaintiffs' claims are not barred by the applicable statute of limitations, any pre-ADA discriminatory acts by Defendants were not forbidden by that law. Thus, Defendants may only be held liable for acts which occurred after January 26, 1992. Similarly, with regard to Duran, Defendants may not be held liable for any discriminatory act under Section 504 before its enactment in 1973.

Defendants next argue that Section 501(b) of the ADA bars Counts I, II, and IV. Section 501(b) provides in part:

Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law, or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter.

42 U.S.C. § 12201(b). Defendants contend that the Illinois Pension Code and the Illinois Administrative Review Act provide an elaborate mechanism for establishing, evaluating, controlling, and reviewing issues related to a police officer's eligibility to participate in the Fund and supplied Plaintiffs with ample opportunity to present their concerns under Section 504 or the ADA.[5] (City's Memorandum, at 11). Neither Piquard nor Duran initiated administrative review proceedings to challenge the decisions of the Board. Therefore, Defendants argue, the Board's decisions are final and binding. Defendants further argue that unless Plaintiffs can affirmatively demonstrate that the state law procedures used to arrive at the decisions denying them participation are subject to a lower standard than the ADA, it would be improper to invalidate the Board's decisions.

Defendants have not cited any authority for their claim that Section 501(b) of the ADA requires Plaintiffs to affirmatively demonstrate that Illinois procedures subjected them to a lower standard than the ADA to maintain an ADA action. The legislative history indicates that with Section 501(b) Congress did not "intend to displace any of the rights or remedies available under other federal or state laws (including state common law) which provide greater or equal protection to individuals with disabilities." House Report ("H.Rep.") No. 101–485(II), 101st Cong., 2d Sess., at 135 (1990), U.S.Code Cong. & Admin.News 1990, at 267, 418. "Under Section 501(b) of the ADA, all of the rights, remedies and procedures that are available to people with disabilities under other federal laws, including Section 504 of the Rehabilitation Act, or other state laws (including state common law), are not preempted by this Act." H.Rep. No. 101–

485(III), at 70, U.S.Code Cong. & Admin.News 1990, at 493. Section 501(b) means that:

A plaintiff may choose to pursue claims under a state law that does not confer greater substantive rights, or even confers fewer substantive rights, if the plaintiff's situation is protected under the alternative law and the remedies are greater. For example, the California Fair Enforcement and Housing Act (FEHA) does not cover persons with mental disabilities. However, the FEHA has been construed to provide compensatory and punitive damages. Because the ADA covers mental disabilities, the FEHA could be construed as not conferring equal or greater rights than the ADA. However, a person with a physical disability may choose to sue under the FEHA, as well as under the ADA, because of the availability of damages under the FEHA. Section 501(b) ensures that the FEHA is not preempted by the ADA.

H.Rep. No. 101–485(III), at 70, U.S.Code Cong. & Admin.News 1990, at 493. Thus, if Illinois' procedures provide equal or greater protections for individuals with disabilities, as Defendants maintain, Section 501(b) only means that those state procedures are not preempted by the ADA and that Plaintiffs may choose to pursue their claims under Illinois law and the ADA. It does not mean that because Illinois has such procedures for reviewing denials of applications into the Fund, those procedures are the sole means for City police officers to bring disability discrimination claims.

Defendants also fail to cite any authority for their claim that since Plaintiffs failed to file an action in state court within 35 days of service of the final decisions of the Board under the Illinois Administrative Review Law, they are barred from seeking federal review of their ADA claims. Defendants believe that the decisions of the Board are final and not subject to any further review. State courts have concurrent jurisdiction over ADA cases, but plaintiffs may obvi-

---

**5.** This is obviously not true as to Plaintiffs because the original denials of their applications occurred before the ADA's enactment and Du-

ran's denial occurred before the enactment of the Rehabilitation Act.

ously decide their choice of forum. *Krouse v. American Sterilizer Co.*, 872 F.Supp. 203, 205 (W.D.Pa.1994). If Plaintiffs had filed an action in state court challenging the Board's decisions as disability discrimination (assuming the ADA had been enacted when the initial decisions were made), a state court judgment would be res judicata in federal court. *Welch v. Johnson*, 907 F.2d 714 (7th Cir.1990); *Pirela v. Village of North Aurora*, 935 F.2d 909 (7th Cir.1991). Thus, the Court rejects the idea that Plaintiffs should have filed a state court action challenging the Board's decisions on the basis of discrimination against their alleged disabilities before filing this action in federal court. To the extent that Defendants argue that Plaintiffs must have challenged the Board's decisions on some other grounds besides disability discrimination before being allowed to bring an ADA action in federal court, they cite no authority for that proposition, and it is also rejected.

Defendants also maintain that as a matter of judicial economy, the Court should abstain in this case because identical proceedings in separate forums are pending. This argument is now mooted by Judge McDade's Order of February 28, 1995 denying the City's Motion to Remand in Case No. 94–1131 and consolidating that case with this one.

As a further argument for dismissal of Plaintiffs' ADA claims, Defendants rely on Section 501(c) of the ADA. Section 501(c) provides that subchapters I through III of this chapter and Title IV of the ADA shall not be construed to prohibit or restrict:

(1) An insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

(2) A person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks

that are based on or not inconsistent with State law; or

(3) A person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapters I and III of this chapter.

42 U.S.C. § 12201(c).

Defendants claim that 501(c) applies to this case because they have established and observed the terms of a bona fide benefit plan which is based on underwriting risks, classifying risks, or administering risks based on or not inconsistent with state law. The only exception to Section 501(c) is if the plan is a "subterfuge" to evade the purposes of the ADA. Section 501(c) provides, with regard to the "subterfuge" exception, that "Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapters I and III of this chapter." Counts I and II are brought pursuant to Title II of the ADA. Defendants argue that by specifically identifying Titles I and III, while excluding Title II, Congress has expressed a clear intent to exempt Title II from the "subterfuge" exception. Thus, Defendants argue, because the Complaint includes facts demonstrating that Defendants fall within 501(c)'s exceptions, no further analysis is required, and their conduct is neither prohibited nor restricted by the ADA, precluding Plaintiffs from stating a claim on which relief may be granted.

Despite Defendants' conclusory claims, the meaning and application of Section 501(c) is not so obvious. Defendants claim that they fall under 501(c)(2), but have not explained what it means to observe or administer the terms of a "bona fide benefit plan" that is based on "underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law" and how they meet this standard.

*"Bona Fide Benefit Plan"*

■ Although the ADA does not define the term "benefit plan," it seems clear that

this Fund, which provides pension and disability benefits to the City's police officers, is included in that term. *See* 29 U.S.C. § 1002(1), (2), and (3) (defining "employee benefit plan" under ERISA as including a fund or program that provides disability and retirement benefits).

■ In *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 194, 98 S.Ct. 444, 446, 54 L.Ed.2d 402 (1977), the Supreme Court held that a benefit plan was "bona fide" within the meaning of Section 4(f)(2) of the Age Discrimination in Employment Act ("ADEA") if it "'exists and pays benefits.'" In *Public Employees Retirement System of Ohio v. Betts*, 492 U.S. 158, 166, 109 S.Ct. 2854, 2861, 106 L.Ed.2d 134 (1989), the Supreme Court reaffirmed *McMann's* definition of "bona fide" as used in Section 4(f)(2) of the ADEA. Congress has not indicated, and the parties do not argue, that "bona fide" in Section 501(c) of the ADA means anything other than the Supreme Court found it did in the ADEA. Thus, a benefit plan is "bona fide" under Section 501(c) of the ADA if it "exists and pays benefits."

*"Underwriting Risks, Classifying Risks, or Administering Such Risks That Are Based On or Not Inconsistent with State Law"*

■ The EEOC's Interim Policy Guidance on ADA and Health Insurance provides that risk classification:

[R]efers to the identification of risk factors and the grouping of those factors that pose similar risks. Risk factors may include characteristics such as age, occupation, personal habits (e.g., smoking), and medical history. Underwriting refers to the application of the various risk factors or risk classes to a particular individual or group (usually only if the group is small) for the purpose of determining whether to provide insurance.

EEOC Interim Policy at 1054–55 n. 15. What does state law say about underwriting, classifying, and administering risks? Much of state insurance regulation is based on model legislation drawn up by the National Association of Insurance Commissioners ("NAIC"), a national organization of state insurance regulators. Nancy Perkins, *Pro-hibiting the Use of the Human Immune Deficiency Virus Antibody Test by Employers*, 25 Harv.J. on Legis. 275, 288 (1988). Since 1960, all 50 states and the District of Columbia have adopted provisions of the NAIC's Unfair Trade Practices Act ("UTPA") in various forms. *Id.; See* 215 ILCS § 5/424(1). Section 4G(2) of the Model UTPA, which has been adopted in whole or in part by 49 states, prohibits:

Making or permitting any unfair discrimination between individuals of the same class and of essentially the same hazard in the amount of premium, policy fees or rates charged for any accident or health insurance policy or in the benefits payable thereunder, or in any of the terms or conditions of such policy ...

NAIC, Model Laws, Regulations and Guidelines, Volume IV (January 1993); Daniel A. Engel & Sherri L. Giffin, *HOT Employees Benefits Issues, Vested Coverages, Retaliation and Americans with Disabilities Act*, 28 Tort & Ins.L.J. 711, 741 (1993). Thus, under the ADA, as the EEOC explains and state law provides, benefit plan classification and administration of risks with regard to disabled persons requires the grouping of individuals of the same class and of essentially the same hazard in the amount of premiums, benefits payable, or any other terms or conditions of such benefit plan. *See also* Section 4G(1) of the NAIC's Model UTPA (discussing unfair discrimination in life insurance or annuities).

■ Section 3 of the NAIC's Model Regulation on Unfair Discrimination in Life and Health Insurance on the Basis of Physical or Mental Impairment prohibits:

[R]efusing to insure, or refusing to continue to insure, or limiting the amount, extent or kind of coverage available to an individual, or charging a different rate for the same coverage solely because of physical or mental impairment, except where the refusal, limitation or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience.

NAIC, Model Laws, Regulations and Guidelines, Volume IV (July 1993); *See also* 215

ILCS §§ 5/236 and 5/364. The ADA's legislative history expressly adopts state insurance unfair discrimination regulation:

> Virtually all States prohibit unfair discrimination among persons of the same class and equal expectation of life. The ADA adopts this prohibition of discrimination. Under the ADA, a person with a disability cannot be denied insurance or be subject to different terms or conditions of insurance based on disability alone, if the disability does not pose increased risks.

H.Rep. No. 101–485(II), at 136; Senate Report ("S.Rep.") 101–116, at 84, U.S.Code Cong. & Admin.News 1990, at 419. The House and Senate Reports further state that:

> [W]hile a plan which limits certain kinds of coverage based on classification of risk would be allowed under this section, the plan may not refuse to insure, or refuse to continue to insure, or limit the amount, extent, or kind of coverage available to an individual, or charge a different rate for the same coverage solely because of a physical or mental impairment, except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience.

H.Rep. No. 101–485(II), at 136–37; S.Rep. 101–116, at 85, U.S.Code Cong. & Admin.News 1990, at 419, 420. These explanations by the House and Senate of the types of benefit plans and practices allowed and prohibited under Section 501(c) exactly mirror Section 3 of the NAIC's Model Regulation on Unfair Discrimination in Life and Health Insurance on the Basis of Physical or Mental Impairment. Thus, Congress expected that under the ADA, a benefit plan or practice which refuses an individual participation solely because of a disability must be supported by actuarial principles or related to actual or reasonably anticipated experience as required by State law.

■ Congress gave the following examples of what state insurance law prohibited and what the ADA would also prohibit:

> For example, a blind person may not be denied based on blindness independent of actuarial risk classification. Likewise with respect to group health insurance cover-

age, an individual with a pre-existing condition may be denied coverage for that condition for the period specified in the policy but cannot be denied coverage for illness or injuries unrelated to the pre-existing condition.

H.Rep. No. 101–485(II), at 137; S.Rep. 101–116, at 85, U.S.Code Cong. & Admin.News 1990, at 420. The inclusion of pre-existing condition clauses in health insurance policies is a traditional insurance underwriting policy allowed by state law. State insurance law also specifically prohibits discrimination against blind persons. *See* 215 ILCS § 5/236(c); 215 ILCS § 5/364.

■ The legislative history also reveals that Congress did not intend the ADA to disrupt insurance industry and employer practices based on risk classification and regulation of insurance by the states.

> As indicated earlier in this report, the main purposes of this legislation include prohibiting discrimination in employment, public services, and places of public accommodation. The Committee does not intend that any provisions of this legislation should affect the way the insurance industry does business in accordance with the State laws and regulations under which it is regulated. . . .

> Because there was some uncertainty over the possible interpretations of the language contained in titles I, II and III, as it applies to insurance, the Committee added section 501(c) to make it clear that this legislation will not disrupt the current nature of insurance underwriting or the current regulatory structure . . . or the insurance industry in sales, underwriting, pricing, administrative and other services, claims, and similar insurance related activities based on classification or risks as regulated by the States. . . .

> In sum, section 501(c) is intended to afford insurers and employers the same opportunities they would enjoy in the absence of this legislation to design and administer insurance products and benefit plans in a manner that is consistent with basic principles of insurance risk classification. This legislation assures that decisions concern-

ing the insurance of persons with disabilities which are not based on bona fide risk classification be made in conformity with non-discrimination requirements. Without such clarification, this legislation would arguably find violative of its provisions any action taken by an insurer or employer which treated disabled persons differently under an insurance or benefit plan because they represent an increased hazard of death or illness.

The provisions recognize that benefit plans (whether insured or not) need to be able to continue business practices in the way they underwrite, classify, and administer risks, so long as they carry out those functions in accordance with accepted principles of insurance risk classification.

H.Rep. No. 101–485(II), at 136–38, U.S.Code Cong. & Admin.News 1990, at 419–421.

### "Subterfuge"

Once it is established that a benefit plan or practice meets 501(c)(1), (2), or (3), it will only be found to violate the ADA if it is shown to be a subterfuge to evade Title I and III's purposes. What does it mean for a plan or practice that underwrites, classifies, or administers risks based on or not inconsistent with State law to be used as a subterfuge to evade the purposes of Titles I and III? It will again be useful to look at the ADEA because Congress also used the word "subterfuge" in that legislation. Plaintiffs argue that the Supreme Court's interpretation of "subterfuge" in the ADEA does not apply to the ADA. Defendants maintain that the Supreme Court's interpretation in *Betts*, 492 U.S. 158, 109 S.Ct. 2854 (1989), regarding the meaning and operation of "subterfuge" in the ADEA is applicable to the ADA.

Section 4(a)(1) of the ADEA provides that it is unlawful for an employer:

To fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1). However, Section 4(f)(2) of the ADEA provides that it is not unlawful for an employer:

[T]o observe the terms of ... any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such ... employee benefit plan shall require or permit the involuntary retirement of any individual ... because of the age of such individual.

29 U.S.C. § 623(f)(2).

In *McMann*, the Supreme Court held that "[i]n ordinary parlance, and in dictionary definitions as well, a subterfuge is a scheme, plan, stratagem, or artifice of evasion." *McMann*, 434 U.S. at 203, 98 S.Ct. at 450. Thus, a pension plan limitation which required mandatory retirement at age 63, adopted before the ADEA was passed, "cannot be a subterfuge to evade" the ADEA. *Id.* In *Betts*, it was argued that *McMann* was no longer good law because in 1978 Congress amended the ADEA to overrule *McMann's* validation of mandatory retirement based on age. *Betts*, 492 U.S. at 167, 109 S.Ct. at 2861. The Supreme Court found that the "1978 amendment to the ADEA did not add a definition of the term 'subterfuge' or modify the language of § 4(f)(2) in any way, other than by inserting the final clause forbidding mandatory retirement based on age." *Id.* at 168, 109 S.Ct. at 2862. "Congress changed the specific result of *McMann* by adding a final clause to § 4(f)(2), but it did not change the controlling, general language of the statute." *Id.* Thus, the *Betts* court reaffirmed its holding in *McMann* that "subterfuge" be given its "ordinary" meaning. Only intentional age discrimination violated section 4(f)(2) of the ADEA based on the ordinary meaning of "subterfuge," "which, in the context of § 4(f)(2) connotes a specific 'intent ... to evade a statutory requirement.'" *Id.* at 171, 109 S.Ct. at 2863 (*quoting McMann*, 434 U.S. at 203, 98 S.Ct. at 450). Moreover, a post-Act benefit or pension plan was a "subterfuge" to evade the purposes of the ADEA only if the age-based plan provisions were (1) intended to discriminate (2) "in some non-fringe-benefit aspect of the employment relation." *Betts*, 492 U.S. at 181, 109 S.Ct. at 2868.

Does the ADEA's prohibition on discrimination in a non-fringe benefit aspect of employment with regard to benefit plans apply to the ADA? The *Betts* court concluded that in order to be a "subterfuge," an age-based distinction had to intentionally discriminate "in a manner forbidden by the substantive provisions of the Act" and that, if the substantive provisions of the ADEA banned age-based distinctions in post-Act benefit and pension plans, Section 4(f)(2)'s exception would be "nugatory with respect to post-Act plans." *Id.* at 176, 177, 109 S.Ct. at 2866. Thus, the Court viewed the substantive prohibitions of the ADEA as not extending to discrimination in fringe benefits because any "alternative interpretation would eviscerate § 4(f)(2)." *Id.*

■■■ Likewise, it seems that under the ADA it would render Section 501(c)(1), (2), and (3) meaningless to interpret the subterfuge sentence as providing that a benefit plan disability distinction may itself constitute a "subterfuge" because Titles I and III prohibit all disability-based distinctions in benefit plans. It would render Section 501(c)(1), (2), and (3) inconsequential to interpret the subterfuge sentence as meaning that benefit plans or practices which meet the requirements of paragraphs (1), (2), and (3) could themselves violate Titles I and III because those titles ban all benefit plan disability-based distinctions. If benefit plans or practices that qualify under paragraph (1), (2), or (3) of Section 501(c) were already prohibited under Titles I and III, then what would be the purpose of including paragraphs (1), (2), and (3) in the statute? Under such an interpretation, benefit plans or practices which qualify under paragraphs (1), (2), or (3) would be prohibited regardless of Section 501(c)'s subterfuge sentence.

To interpret the last sentence of 501(c) as prohibiting the use of benefit plans or practices to discriminate against persons with disabilities in non-fringe benefits decisions (e.g., fire or refuse to hire an individual) would be logical. The example used in the House and Senate Reports' discussion of Section 501(c) supports this interpretation. The House and Senate Reports interpret the "subterfuge" language of Section 501(c) as

prohibiting an employer from refusing to offer "a qualified applicant a job because the employer's current insurance plan does not cover the person's disability or because of the increased costs of the insurance." H.Rep. No. 101–485(II), at 136; H.Rep. No. 101–485(III), at 71; S.Rep. 101–116, at 85, U.S.Code Cong. & Admin.News 1990, at 419, 494.

There is evidence in the ADA's legislative history indicating that Congress intended the word "subterfuge" to have a different meaning from that in the ADEA. According to Rep. Edwards:

> The term "subterfuge" is used in the ADA simply to denote a means of evading the purposes of the ADA. It does not mean that there must be some malicious intent to evade the ADA on the part of the insurance company or other organization, nor does it mean that a plan is automatically shielded just because it was put into place before the ADA was passed. Indeed, there is currently a bill moving through Congress to overturn the *Betts* decision and we have no intention of repeating a decision in the ADA with which we do not agree.

136 Cong.Rec. H4,624 (daily ed. May 17, 1990) (statement of Rep. Edwards). Senator Kennedy also discussed the use of "subterfuge" under the ADA and stated that:

> [I]t is important to note that the term "subterfuge," as used in the ADA, should not be interpreted in the manner in which the Supreme Court interpreted the term in [*Betts*]. The term "subterfuge" is used in the ADA to denote a means of evading the purposes of the ADA. Under its plain meaning, it does not connote that there must be some malicious or purposeful intent to evade the ADA on the part of the insurance company ... It also does not mean that a plan is automatically shielded just because it was put into place before the ADA was passed.

136 Cong.Rec. S9,697 (daily ed. July 13, 1990) (statement of Sen. Kennedy). Further, the House Report states that the subterfuge language applies regardless of the date the insurance plan or an employer benefit plan was adopted. H.Rep. No. 101–485(II), at 137;

**1124**

S.Rep. 101–116, at 85; *See also* 29 C.F.R. § 1630.16(f), App.

However, these Congressional comments and reports do not discuss the application of the second holding in *Betts* that "subterfuge" was meant only to prohibit benefit plan terms or practices which discriminated in non-fringe benefit aspects of the employment relationship because any other meaning would render § 4(f)(2) of the ADEA nugatory. The House and Senate Reports and the selected comments from Congressmen indicate only disapproval with the *Betts* holding that the definition of "subterfuge" requires an intent and that pre-ADEA plans could not be a subterfuge.

Similar to the ADEA, Section 102(a) of Title I of the ADA prohibits an employer from discriminating in regard to compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 12112(a). The *Betts* court interpreted the phrase "compensation, terms, conditions, or privileges of employment" as not including benefit plans of the type covered under § 4(f)(2) of the ADEA. *Betts*, 492 U.S. 158, 109 S.Ct. 2854. The EEOC believes that since the ADA, as opposed to the ADEA, "expressly cover[s] fringe benefits," the ADA is distinguishable from the ADEA and is thus insulated from *Betts'* fringe benefit protection. EEOC Interim Policy at 1053 n. 10.

The House and Senate Reports state that Section 102(a) of the ADA includes employment decisions in "(6) fringe benefits available by virtue of employment, whether or not administered by the covered entity." H.Rep. No. 101–485(II), at 55; S.Rep. No. 101–116, at 25, U.S.Code Cong. & Admin.News 1990, at 337. The ADA also defines "discriminate" in 42 U.S.C. § 12112(a) as including:

(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing *fringe benefits* to an employee of the covered entity, or an organization pro-

viding training and apprenticeship programs).

42 U.S.C. § 12112(b)(2) (emphasis added).

 This legislative history of the ADA and Section 12112(b)(2) can be reconciled with this Court's interpretation of the meaning of Section 501(c)'s subterfuge sentence. The ADA does prohibit discrimination in fringe benefits, including benefit plans, but Congress has also carved out a large exception for benefit plans which qualify under Section 501(c)(1), (2), or (3). Thus, a benefit plan or practice which discriminates against persons with disabilities and does not fall within Section 501(c)(1), (2), or (3)'s exception violates Section 102(a) of Title I. Section 12112(b)(2) was merely intended to prohibit an entity from doing through a contractual relationship what it may not do directly. H.Rep. No. 101–485(III), at 36. An entity may not contract with organizations which provide employee fringe benefits if the relationship subjects the disabled employee "to the discrimination prohibited by this title." Section 102(a)'s prohibition on discrimination includes benefit plans or practices which do not meet the requirements of Section 501(c)(1), (2), or (3). Thus, under Section 12112(b)(2), an employer may not contract with another organization which discriminates against the employer's employees in the area of benefit plans if the organization's practices do not qualify under of Section 501(c)(1), (2), or (3).

The EEOC's Interim Policy provides that insurance decisions not based on a valid cost rationale are discriminatory and constitute a subterfuge. According to the EEOC, " 'Subterfuge' refers to disability-based treatment that is not justified by the risk or costs associated with the disability." Interim Policy at 1054. The EEOC's interpretation of the meaning of the subterfuge sentence seems to be repetitive of the requirements of at least paragraphs (1) and (2) of Section 501(c), which require that benefit plan decisions based on disabilities be based on the grouping of similar risks and sound actuarial principles or active or reasonably anticipated experience to be exempt under the ADA. If a benefit plan or practice qualifies under paragraphs (1) or (2) because it underwrites,

classifies, or administers risks based on or not inconsistent with State law and thus is not prohibited by the ADA, what would it mean to interpret Section 501(c)'s subterfuge sentence as providing that if that same benefit plan or practice's disability-based treatment is not justified by the risk or costs associated with the disability, it violates the ADA? It seems that if the benefit plan disability-based distinction or treatment is not based on the risks or costs associated with the disability, then it would not qualify for 501(c)(1) or (2)'s exception and is prohibited by Section 102(a).

In *Betts*, the EEOC also argued that the "subterfuge" exception to § 4(f)(2) of the ADEA required employers to show a cost-based justification for age-based distinctions in employee benefit plans. The Supreme Court rejected this interpretation of § 4(f)(2) as including a cost-justification requirement as contrary to the plain language of the statute. *Betts*, 492 U.S. at 169–175, 109 S.Ct. at 2862–65. Similarly, the plain language of Section 501(c)'s "subterfuge" sentence does not mention the risks or costs of a disability-based distinction.

Plaintiffs argue that the Older Worker Benefit Protections Act of 1990 amended the ADEA to provide that a benefit plan that has cost-based justification enjoys a presumption that it is not an unlawful "subterfuge" to evade the purposes of the Act. *See* 29 U.S.C. § 623(f)(2). Thus, Plaintiffs argue, *Betts* does not apply to the ADA. Section 623(f)(2) of the ADEA, however, does not redefine the word "subterfuge" as requiring cost-based justifications.

■■■■ Accordingly, the Court rejects the EEOC's Interim Policy's definition of "subterfuge" and holds that the subterfuge sentence of Section 501(c) means that a benefit plan disability-based distinction based on underwriting, classifying, or administering risks that is based on or not inconsistent with State law may not be used to discriminate in non-fringe benefit areas of employment. Since Plaintiffs do not allege that they are being discriminated against in a non-fringe benefit area of employment, the subterfuge sentence of Section 501(c) is inapplicable to this case. Thus, the fact that Title II is

omitted from the subterfuge sentence is not dispositive, as Defendants maintain. Having decided that the last sentence of 501(c) prohibits using paragraphs (1), (2), or (3) to discriminate in a non-fringe benefit aspect of employment and that Plaintiffs have not made such an allegation here, the Court need not decide whether the *Betts* definition of "subterfuge" as including an intent element applies under the ADA.

Defendants further maintain that "plaintiffs must allege why 501(c) does not preclude their claim." In *Betts*, the Supreme Court held that § 4(f)(2) of the ADEA was not a defense to a charge of age discrimination but, rather, by requiring a showing of actual intent to discriminate, redefined the elements of a plaintiff's prima facie case. *Betts*, 492 U.S. at 181, 109 S.Ct. at 2868–69.

> Thus, when a employee seeks to challenge a benefit plan provision as a subterfuge to evade the purposes of the Act, the employee bears the burden of proving that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some non-fringe-benefit aspect of the employment relation.

*Id.*

The EEOC's Interim Policy indicates that it should be the defendant who bears the burden of proving that a health insurance plan is either a bona fide insured plan that is not inconsistent with state law, or a bona fide self-insured plan. Interim Policy at 1054. The EEOC believes that the defendant must also prove that a challenged disability-based distinction is not being used as a subterfuge. *Id.* The EEOC explains that requiring the defendant to bear the burden of proof is consistent with the principle that the burden of proof should rest with the party who has the greatest access to the relevant facts. In the health insurance context, the defendant employer and/or employer's insurer has control of the risk assessment, actuarial, and/or claims data relied upon in adopting the challenged disability-based distinction. The plaintiff has no access to such data. *Id.* Although the EEOC's Interim Policy only addresses employer-provided health insurance plans and not the application of the ADA to other types of benefits, such as

employer-provided pension plans and disability insurance, the EEOC's reasoning applies with equal force to this case. *Id.* at 1051. Under the Court's prior interpretation of Section 501(c), the risk assessment and actuarial data that a defendant must provide to come within the benefit plan exception would be required under Section 501(c)(1) and (2), not the subterfuge sentence of Section 501. Whether plaintiffs must bear the burden of proving that a benefit plan or practice that qualifies under paragraph (1), (2), or (3) is being used by defendants as a subterfuge to evade the purposes of Titles I or III (i.e., being used to discriminate in a non-fringe-benefit aspect of employment) need not be decided in this case.

■ In sum, if Defendants prove that they fall within either Section 501(c)(1), (2), or (3)'s exceptions to the ADA for benefit plans or practices, then they may prevail. However, the Court cannot say that Plaintiffs can prove no set of facts in support of their claim which would entitle them to relief and that, on the basis of a motion to dismiss, Defendants are excluded from liability pursuant to Section 501(c)(2), as they claim.

The City also argues that under Section 3–150 and 3–132 of the Pension Code, it has no authority to grant participation in the Fund or provide alternative benefits. Section 3–150 of the Pension Code provides:

> A home-rule unit as defined in Article VII of the 1970 Illinois Constitution or any amendment thereto shall have no power to change, alter or amend, in any way, the provisions of this article. A home-rule which is a municipality as defined in § 3–103 shall not provide singly or as part of any plan or program, by any means whatsoever, any type of retirement or annuity benefit to a police officer other than through the establishment of a fund as provided in this article.

40 ILCS § 5/3–150. Section 3–132 provides that the Board, not the City, shall have the power and the duty to control and manage the Fund.

"In determining whether a state statute is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress." *California Federal Sav. and Loan Ass'n v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1986). Congress has stated that the purpose of the ADA is:

> (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
>
> (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
>
> (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and
>
> (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101(b). Consistent with the national mandate eliminating discrimination against individuals with disabilities, Section 501(b) of the ADA provides that state laws which provide greater or equal protection to individuals with disabilities are not preempted. Section 501(c)(1) and (2) provide that state insurance laws regarding classifying, administering, and underwriting risks are not preempted as to benefit plans under the ADA. Section 501(c)(3) "clarifies that self-insured plans, which are currently governed by the preemption provisions of the Employment Retirement Income Security Act (ERISA), are still governed by that preemption provision and are not subject to state insurance laws." H.Rep. No. 101–485(II), at 137, U.S.Code Cong. & Admin.News 1990, at 420.

■ Where Congress has not entirely displaced state regulation:

> [F]ederal law may ... pre-empt state law to the extent it actually conflicts with federal law ... because "compliance with both federal and state regulations is a physical impossibility" or because the state law

stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Guerra*, 479 U.S. at 281, 107 S.Ct. at 689 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963) and *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Thus, state laws that conflict with the ADA by standing as an obstacle to full enforcement of Congress' goals or do not fall within the Section 501(c) benefit plan exception are preempted. Defendants have not maintained that Sections 3–150 or 3–132 provide greater or equal rights to disabled persons than the ADA does. These sections do not relate to insurance classification of risks. Thus, if it is found that Plaintiffs are being discriminated against because of their impairments in violation of the ADA and Sections 3–150 and 3–132 somehow prevent the City from providing Plaintiffs with benefits, then those sections conflict with the ADA or are inconsistent with its purposes and are preempted.

■ Defendants maintain that Count IV should be dismissed because Plaintiffs have failed to join as a defendant an indispensable party, the State of Illinois, under Rule 19(a). Defendants argue that because Plaintiffs challenge the validity of an Illinois statute which can only be changed or modified by the legislature, the State of Illinois is an indispensable party. Count IV alleges that Defendants:

> [Continue] to give force and effect to provisions of the Illinois Statutes, 40 ILCS 5/3–101, *et seq.,* which on their face and as applied discriminate against qualified individuals with disabilities; deny such individuals entry, on the basis of their disabilities, into the Police Pension Fund; and are contrary to and in conflict with provisions of Title I of the ADA.

Amend. to Complaint, at 2. Count IV also seeks a declaratory judgment that Section 5/3–150 of the Pension Code is either preempted by or violates the ADA insofar as it conflicts with the City's and the Board's duty under the ADA to reasonably accommodate Piquard's and Duran's alleged disabilities.

Although Plaintiffs allege that the Illinois Pension Code discriminates against individuals with disabilities on its face, they do not cite to any specific section which on its face discriminates against individuals with disabilities. This inexact and broad allegation is an insufficient reason for requiring joinder of the State. Defendants' reliance on *United States v. Illinois*, 1994 WL 562180 (N.D.Ill. Sep. 12, 1994), is misplaced. In that case, the court held that the State of Illinois was a proper party to a similar suit because it was an employer, not that the State of Illinois was an indispensable party under Rule 19. *Id.* at *2–3. Further, Defendants cannot rely on Section 5/3–150 to defeat Plaintiffs' ADA and Section 504 claims. The purpose of Section 5/3–150 is to ensure that all Illinois police officers receive uniform pension benefits by preventing individual municipalities from enacting local ordinances that alter the benefits established by the Illinois Pension Code. *Holmes v. City of Aurora*, 1993 WL 512629, *3 (N.D.Ill. Dec. 9, 1993) (citing Illinois law).

> Requiring the City to provide plaintiff[s] with the same benefits that other non-disabled Illinois police officers receive under the Pension Code would in no way conflict with the purpose of Section 5/3–150. Plaintiff[s] [are] not asking the City to provide [them] any benefits that are different from those received by other officers. In providing plaintiff[s] the relief [they] seek, the City would not be required to alter or change the benefits established by the Illinois Pension Code in violation of Section 5/3–150.

*Id.* at *4. Defendants' claim that the State of Illinois is an indispensable party because without its joinder complete relief cannot be accorded among those already parties is rejected.

■ Finally, the Board's Motion to Dismiss Count IV argues that it is not an employer under the ADA. This argument is rejected as it is presented without any citation to authority and supportive legal memorandum, as required by Local Rule 2.9(B).

### Motions to Strike (# 25, # 26, # 38, # 41)

*City's Motion to Strike Affidavit of Jerome Duran (# 25)*

"Dr. Lowry noted on the form that 'Mr. Duran wore very thick eyeglasses and, for

this reason, Dr. Lowry did not wish to complete this portion of the examination form'" is stricken from Paragraph 4. The 10/30/67 notation regarding Dr. Lowry is also stricken from Exhibit 1. The remainder of Exhibit 1 and Paragraph 4 are not stricken. Paragraphs 5, 6, 7, and Exhibit 3 are stricken. Paragraphs 8, 9, 10, 11, 12, 13, 16 and 17 and Exhibits 4, 5 and 7 are not stricken.

### City's Motion to Strike Affidavit of Mark Piquard (# 26)

Paragraphs 10, 13, 20 and Exhibits 4 and 5 are not stricken. Paragraphs 12, 16, 17, and 18 are stricken.

### Plaintiffs' Motions to Strike (# 38 and # 41)

Plaintiffs' Motion to Strike Portions of Affidavit of Donald Stoner is DENIED. Plaintiffs' Motion to Strike City of East Peoria's Response to Plaintiffs' Combined Motion and Memorandum in Support of Motion to Strike Portions of Affidavit of Donald Stoner as untimely is GRANTED.

### Plaintiffs' Motion for Summary Judgment (# 18)

Plaintiffs seek summary judgment on the issue of whether the denial of their participation in the Fund is a violation of Title II of the ADA. In the alternative, Plaintiffs request that the Court enter summary judgment in their favor on the following nine issues:

1. Whether the City and the Board are "public entities" under 42 U.S.C. § 12132.

2. Whether Plaintiffs are each a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2) and 42 U.S.C. § 12132.

3. Whether under Title II of the ADA, the City and Board are required to provide Plaintiffs the opportunity to pension benefits under 40 ILCS 5/3–111 on an equal basis with non-disabled officers.

4. Whether Plaintiffs' ADA and Section 504 claims are barred by the applicable statute of limitations.

5. Whether the Board may rely on Section 5/3–106 of the Illinois Pension Code to defeat Plaintiffs' claims under the ADA.

6. Whether the City may rely on Section 5/3–150 of the Illinois Pension Code to defeat Plaintiffs' ADA and Section 504 claims against the City.

7. Whether Section 501(b) of the ADA requires Plaintiffs to exhaust their state administrative remedies prior to bringing their claims in federal court.

8. Whether Section 501(c) of the ADA exempts the City or the Board from complying with the ADA unless it can be demonstrated that the disability-based disparate treatment is justified by the risks or costs associated with the disability.

9. Whether Section 501(c) of the ADA exempts the City from the requirements of the ADA in providing fringe benefits to Plaintiffs as their employer.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A motion for summary judgment must demonstrate, based on the record, an absence of evidence to support the nonmoving case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(e). The record and all reasonable inferences drawn from it are viewed in the non-movant's favor. *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

### Issue 1—"Public Entities"

Title II of the ADA provides:

No qualified individuals with a disability shall, by reason of such disability, be ex-

cluded from participation in or be denied the benefits of the services, programs or activities of a public entity or be subject to discrimination by any [public] entity.

42 U.S.C. § 12132. Title II defines "public entity" in relevant part as:

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government ...

42 U.S.C. § 12131(1). The City admits that it is a local government within the definition of "public entity." The Board states that the Fund appears to be an "other instrumentality of the State," but both the City and the Board maintain that the Board is not a public entity. Plaintiffs maintain that the Board is a statutorily-created body responsible for administering the City's pension funds for the benefit of public employees. 40 ILCS § 5/3–128. Two of the Board members may be appointed by the Mayor of the City. *Id.* An instrumentality is defined as "something by which an end is achieved; a means, medium, agency." BLACK'S LAW DICTIONARY 801 (6th ed. 1990). The relationship between the Board and the State and City indicate that the Board is a public entity under the ADA. *Holmes v. City of Aurora,* 1995 WL 21606, *4 (N.D.Ill. January 18, 1995). The Board is used as the means or medium by which the City determines eligibility for pension and disability benefits for its employees.

### Issue 2—"Qualified Individual with a Disability"

Duran and Piquard maintain that they are qualified individuals with disabilities for purposes of Title II of the ADA since they are individuals with disabilities, astigmatism and spondylolisthesis respectively, who with or without reasonable modification to the policies and practices of the Board, meet the essential requirement for participation in the Fund. Defendants argue that the questions of whether Plaintiffs are "qualified individuals with a disability" and "individuals with disabilities" involve factual matters on which they have not had an opportunity to conduct discovery, and under Federal Rule of Civil Procedure 56(f), they cannot

submit affidavits complying with Fed. R.Civ.P. 56(e).

The ADA defines "qualified individual with a disability" as:

[A]n individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). To be "qualified individual[s] with a disability," Plaintiffs must establish that they are each an individual with a "disability" as defined in 42 U.S.C. § 12102(2) of the ADA. Disability is defined as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Plaintiffs claim that Defendants regarded them as having such impairments. The perception of the covered entity is a key element of the regarded as test. H.Rep. No. 101–485(III), at 30–31.

"Is regarded as having such an impairment" means:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(*l*).

An individual satisfies the first part of this [regarded as] definition if the individual has an impairment that is not substantially

limiting, but the covered entity perceives the impairment as being substantially limiting. For example, suppose an employee has controlled high blood pressure that is not significantly limiting. If an employer reassigns the individual to less strenuous work because of unsubstantiated fears that the individual will suffer a heart attack if he or she continues to perform strenuous work, the employer would be regarding the individual as disabled.

29 C.F.R. § 1630.2(*l* ), App. Plaintiffs argue that their situation is directly analogous to the above example where an employee's work duties were changed due to the employer's perception regarding an impairment. Plaintiffs further argue that no discovery on their physical condition is necessary to make a determination on whether they are individuals with disabilities.

To prove they are disabled under the ADA, Plaintiffs must establish two components. First, they must show that they are persons having a qualifying physical or mental impairment. *Flasza v. Holland Motor Exp., Inc.,* 1994 WL 529392, *5 (N.D.Ill. Sep. 27, 1994). A physical or mental impairment means:

Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine . . .

29 C.F.R. § 1630.2(h)(1). "The existence of an impairment is to be determined without regard to mitigating measures such as medicines, or assistive or prosthetic devices." 29 C.F.R. § 1630.2(h), App. For example, an individual with hearing loss would be considered to have an impairment even if the condition were correctable through use of a hearing aid. *Id.*

Second, Plaintiffs must show that Defendants treated their qualifying impairments as substantially limiting one or more of their major life activities. "Substantially limits" means "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major

life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(ii). The following factors should be considered in determining whether an individual is substantially limited in a major life activity: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long-term impact or the expected long-term impact of or resulting from the impairment. *Id.* at § 1620.2(j)(2). In addition to factors listed above, the following factors should be considered when determining whether an individual is substantially limited in the major life activity of "working":

(A) the geographical area to which the individual has reasonable access;

(B) the jobs from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) the job from which an individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. 1630.2(j)(3)(ii). Further, with respect to the major life activity of working, "substantially limits" means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. 29 C.F.R. § 1630.2(j)(3)(i). The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *Id.*

"The proper test is whether the impairment, *as perceived,* would affect the individual's ability to find work across the spectrum of same or similar jobs." *Partlow v. Run-*

*yon,* 826 F.Supp. 40, 45 (D.N.H.1993) (applying "regarded as" test under Rehabilitation Act). Thus, if Defendants regarded Plaintiffs as suffering from physical impairments that Defendants believed substantially limited a major life activity, Plaintiffs are disabled under the ADA. *Stradley v. Lafourche Communications, Inc.,* 869 F.Supp. 442, 443 (E.D.La.1994).

Plaintiffs claim that no dispute exists that they are not provided the same fringe benefits as other City police officers because of their respective physical impairments, which the Board has concluded renders them more prone to becoming disabled than a policeman without their impairments. Plaintiffs argue that Defendants are "admittedly 'regarding' Plaintiffs as unfit to be police officers under Illinois law. Accordingly, they are being disqualified from an entire profession because they are 'regarded as being disabled.'" Plaintiffs' Response at 4. Since the inability to perform a single job does not constitute a substantial limitation in the major life activity of working, Plaintiffs maintain that this perception of Defendants is not a limitation which would apply only to police officers. According to Plaintiffs, "every employer which normally provides pension benefits could stereotypically 'regard' individuals with such impairments as possible drains on their pension plans. Thus, the discriminatory effects of 'regarding Plaintiffs as disabled' cuts across all professions and 'substantially impairs' Plaintiffs." Plaintiffs' Response at 5.

■ A "qualified individual with a disability" is someone who can perform the essential functions of his job with or without accommodation. A qualified individual with a disability shall not, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132. A "qualified individual with a disability" is defined as an individual with a disability who has the requisite skill, experience, education and other job-related requirements and who can, with or without reasonable accommodation, perform the essential functions of such position. 29 C.F.R. § 1630.2(m). Reasonable accommodation includes modification or adjustments that en-

able a disabled employee to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities. 29 C.F.R. § 1630.2(*o*)(iii). However, an employer is not required to provide an accommodation that is unreasonable or would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A). The burden is on Defendants to demonstrate that an accommodation would impose an undue hardship. 29 C.F.R. § 1630.9(a) (reasonable accommodation required unless "covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business.").

The eligibility requirements for participation in the Fund are:

> Any person who (1) is appointed to the police force of a police department and sworn and commissioned to perform police duties; (2) is found upon examination of duly licensed physician or physicians selected by the board to be physically and mentally fit to perform the duties of a police officer; and (3) within 3 months after receiving his or her first appointment, and if reappointed, within 3 months thereafter, makes written application to the board to come under the provisions of this Article.

40 ILCS § 5/3–106. Plaintiffs argue that they meet the definition of qualified individuals with disabilities because they are individuals with disabilities who have the skill, experience, and education necessary to be police officers and have been performing the essential functions of the job without reasonable accommodations for years. Plaintiffs maintain that Defendants have not provided any reliable data regarding what burden accommodating Plaintiffs would pose on them. Plaintiffs further argue that with regard to pension benefits and not disability benefits, their alleged propensity to become disabled does not mean increased costs to the Fund. To the extent they are more likely to become unable to work due to their physical impairments, Plaintiffs believe this would decrease the potential liability of the Fund since Plaintiffs would be less likely to obtain the years of "creditable service" necessary to receive maximum benefits.

A motion for summary judgment should not be granted "unless it is abundantly clear that no material issue of fact exists." *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1002 (7th Cir.1994). Defendants have stated throughout their Memorandum in opposition to Plaintiffs' Motion for Summary Judgment that no discovery has occurred and, in the City's Statement of Genuine issues that, pursuant to Rule 56(f) it cannot submit affidavits complying with Rule 56(e). It is not "abundantly clear" at this point in the litigation that Plaintiffs are entitled to summary judgment on the numerous factual questions raised by the issue of whether Plaintiffs are qualified individuals with disabilities. In fact, no evidence has been presented regarding the individual Board members' specific perceptions of Plaintiffs' impairments. Defendants are entitled to conduct discovery on these matters. Accordingly, Plaintiffs' Motion for Summary Judgment on the issue of whether they are individuals with disabilities under 42 U.S.C. §§ 12131(2) and 12132 is denied without prejudice to a later reassertion of these arguments after the necessary discovery is completed.

 Lastly, the City maintains in its Motion to Dismiss and opposition to Plaintiffs' Motion for Summary Judgment that even if the exclusion of Plaintiffs from the Fund violates the ADA, it is solely the Fund's liability. The City argues that it has not discriminated against Plaintiffs because it does not provide pension and/or disability benefits to any officers it employs. The City claims that it has merely established the Fund which allows its officers to apply to the Board. The ADA prohibits employers from indirectly discriminating on the basis of a disability with regard to fringe benefits. 42 U.S.C. § 12112(b)(2). See also 29 C.F.R. § 1630.6(a) and 28 C.F.R. § 35.130(b)(1)(v). The City is also not as detached as it claims to be. The Fund was set up by action of the City and exists only for the City's employees. The City has imposed and collects taxes to support the Fund. (Gualandi Affidavit, p. 2). The mayor of the City may appoint two Board members. 40 ILCS § 5/3–128. Any claim that the City cannot be liable as Plaintiffs' employer is rejected.

**Plaintiffs' Remaining Issues**

Plaintiffs' Motion for Summary Judgment on Issue 3 is denied without prejudice until the necessary discovery is completed. Defendants assert that the remaining Issues which Plaintiffs request summary judgment on are legal ones which the Court may rule as a matter of law. See City's Opposition to Summary Judgment, at 6. Accordingly, the Court finds that, as a matter of law, Plaintiffs' claims are not barred by the applicable statute of limitations (Issue 4), the City and the Board may not rely on Sections 5/3–106 and 5/3–150 of the Illinois Pension Code to defeat Plaintiffs' claims (Issues 5 and 6), and Section 501(b) of the ADA does not require Plaintiffs to file state actions challenging the Board's decisions prior to bringing this federal ADA suit (Issue 7). As the Court cannot say at this time that no genuine issues of material fact are in dispute and Plaintiffs are entitled to judgment as a matter of law on Issues 8 and 9, summary judgment must be denied without prejudice. Defendants are entitled to conduct whatever discovery is necessary to try to prove that they fall within the Section 501(c) exception as interpreted in this Order.

*CONCLUSION*

For the reasons stated above, the City's Motion to Dismiss (# 10) is DENIED, the Board's Motion to Dismiss (# 11) is DENIED, Plaintiffs' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE, the City's Motions to Strike Affidavits of Jerome Duran and Mark Piquard (# 25 and # 26) are GRANTED IN PART and DENIED IN PART, Plaintiffs' Motion to Strike Portions of Affidavit of Donald Stoner (# 38) is DENIED, Plaintiffs' Motion to Strike the City's Response to Plaintiffs' Motion to Strike Portions of Affidavit of Donald Stoner (# 41) is GRANTED, the City's Motion to Dismiss Count IV (# 45) is DENIED, and the Board's Motion to Dismiss Count IV (# 47) is DENIED.