Mark CLOUTIER, Plaintiff,

v.

**PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation, Defendant.**

No. C–96–1166 WHO.

United States District Court, N.D. California.

April 22, 1997.

Emily Doskow, Oakland, CA, for Plaintiff.

Steven Frankel, Mary Lacy, Sonnenschein, Nath & Rosenthal, San Francisco, CA, for Defendant.

## OPINION AND ORDER

ORRICK, District Judge.

The Memorandum Decision and Order filed in this action on March 24, 1997, is redesignated as an Opinion and Order and is amended as follows:

Plaintiff Mark Cloutier filed this action on March 29, 1996 against defendant Prudential Life Insurance Company of America ("Prudential"), asserting claims under of Title III of the Americans with Disabilities Act ("Title III" or "ADA"), 42 U.S.C. § 12101 *et seq.,* the Unruh Civil Rights Act ("Unruh Act"), § 51 *et seq.* of the California Civil Code, and § 10140 of the California Insurance Code, and for negligent and intentional infliction of emotional distress. Prudential now moves for summary judgment as to all causes of action. By stipulation of the parties, the Court dismisses the § 10140 and emotional distress claims. For the reasons stated herein, the Court otherwise denies Prudential's motion for summary judgment.

## I.

On February 8, 1995, plaintiff applied for an individual Variable Appreciable Life insurance policy from Prudential in the face amount of $500,000. With plaintiff's consent, Prudential reviewed his medical records, in accordance with its standard individual policy underwriting procedures. Those records revealed that plaintiff "has safe sex through [a] partner [who] is HIV [-positive]" and that plaintiff "has had persistently low CD-4 [white cell blood] count." (Joint Statement of Undisputed Facts ("Joint Statement") ¶ 4; Spessard Decl. ¶ 4, Ex. C.) The records also revealed an HIV-negative result in plaintiff's own blood test. Plaintiff attributes his low CD4 blood count to an unrelated bout with a viral infection many years ago, an assessment that Prudential apparently does not dispute.

The Prudential underwriter, Sara Lang, referred the file to Prudential's Director of Medical Services, Dr. Amy Bennett, and to two other Prudential underwriting officials. Each recommended that Prudential decline plaintiff's application. Plaintiff alleges that deposition testimony of these key Prudential employees reveals that none of them "consulted medical literature, epidemiological experts, or even in-house actuaries," in arriving at their conclusion. (Pl.'s Opp'n at 4:1–2.) On March 31, 1995, Prudential issued a letter to plaintiff reciting its decision.

Plaintiff requested further information, and on August 1, 1995, Prudential issued a second letter, characterizing plaintiff's situation as "rare," but explaining that Prudential had "consistently declined applications received from HIV negative individuals who [were] in a [sexual] relationship with an HIV positive partner." (Joint Statement ¶ 13; Spessard Decl. ¶ 9, Ex. F.) The parties do not dispute that Prudential refuses to issue individually underwritten life insurance policies to *any* individual regardless of gender, sexual orientation, race, etc., where the applicant's file reveals that the applicant engages in sexual relations with an HIV-positive partner.

In October 1995, plaintiff applied to participate in his employer's group underwritten life insurance policy, in the face amount of $57,000, the maximum allowable under the employer's plan. Prudential issued that policy in November without consulting plaintiff's medical records, as the company's guidelines did not require a medical review for the issuance of policies to participants in group plans.

In June and July 1996, New York Life Insurance Company ("New York Life") issued two individual life insurance policies to

plaintiff in the face amounts of $500,000 and $250,000, respectively. (Cloutier Decl. Exs. A & B.) Plaintiff alleges that he informed the New York Life agent—as he informed Prudential—of the medical history of himself and his partner, and that he authorized the release of the same medical records to New York Life.

On March 29, 1996, plaintiff filed his complaint, and Prudential now moves for summary judgment on all claims. Plaintiff does not contest Prudential's motion as to the § 10140 and emotional distress claims, leaving only the ADA and Unruh Act claims for the Court's resolution.

## II.

### A.

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party seeking summary judgment must show the absence of a genuine issue of material fact to prevail. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) Once the movant has made this showing, the nonmovant must "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). Nonetheless, the Court must view inferences drawn from the evidence in the light most favorable to the nonmoving party. *United States v. Die-*

*bold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

### B.

In relevant part, Title III of the ADA prohibits the discrimination of persons "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases ... or operates a place of public accommodation." 42 U.S.C. § 12182(a) (1995). The list of specific prohibitions includes "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully enjoying any goods, services, facilities, [etc.]" and "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, [etc.] to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A)(i)–(ii). While these provisions would appear to subject Prudential to the ADA's antidiscrimination provisions, § 501(c) (now codified at 42 U.S.C. § 12201(c)) contains an explicit "safe harbor" for insurance companies. Specifically, § 501(c)(1) provides that the ADA "shall not be construed to prohibit or restrict .(1) an insurer ... from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law." 42 U.S.C. § 12201(c)(1) (1995).

Plaintiff claims standing to sue under the ADA by virtue of the statute's prohibition of discrimination against "an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E). Plaintiff's partner, who is HIV-positive, has a cognizable physical disability.

### 1.

Prudential first argues that plaintiff "lacks standing" to pursue an ADA claim because these provisions merely prohibit discrimination in providing physical access to offices, restaurants, amusement parks, and

other places of public accommodation.[1] Prudential's refusal to issue an insurance policy has nothing to do with plaintiff's ability to obtain physical access to Prudential offices and, hence, Prudential argues, does not give rise to a Title III claim.

Nothing within the plain language of the statute lends itself to such a narrow reading. The statute's general prohibitions ban the discriminatory "denial of the opportunity . . . to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i). The Court should construe statutes to "avoid rendering superfluous any parts thereof." *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 112, 111 S.Ct. 2166, 2171–72, 115 L.Ed.2d 96 (1991) (citation omitted). Interpreting Title III to prohibit only physical barriers to the access of "facilities" would dispense with the language mandating equal opportunity to "participate in or benefit from" the "goods," "services," "privileges," and "advantages" of a commercial transaction.[2] Equally telling, Title III's specific prohibitions against discriminatory "application of eligibility criteria," "failure to make reasonable modifications in policies, practices, or procedures," and "failure to take such steps . . . to ensure that no individual with a disability is excluded, denied services, or otherwise treated differently," could easily apply to the case of an insurer's rejection of a prospective customer without any physical barriers to access. 42 U.S.C. § 12182(b)(2)(A)(i)–(iii); *see Kotev v. First Colony Life Ins. Co.,* 927 F.Supp. 1316, 1321–22 (C.D.Cal.1996) (relying in part on § 12182(b)(2)(A)(i–iii) to determine that Title III applied to insurer's rejection of policy applicant).

Although the Ninth Circuit has not spoken on this issue, two courts within this circuit have similarly applied a broad reading to the term "place of public accommodation" in the statute. *See Shultz v. Hemet Youth Pony League, Inc.,* 943 F.Supp. 1222, 1225 (C.D.Cal.1996) (granting plaintiff's summary judgment motion on Title III claim where youth baseball league excluded him due to his affliction with palsy); *Kotev,* 927 F.Supp. 1316. In particular, *Kotev*'s facts lie on all fours with those of the instant case; there, the plaintiff, whose spouse was diagnosed with HIV, sued an insurer for its refusal to issue him a policy. *Id.* at 1318. The insurer moved to dismiss under Fed.R.Civ.P. 12(b), alleging that the ADA does not encompass an insurer's denial of a policy application. *Id.* at 1320–21. The court denied the motion after a lengthy examination of the statutory language and legislative history. *Id.* at 1320–23. The thorough reasoning of *Kotev,* as well as that of courts in other circuits, suffice to persuade this Court of the applicability of Title III to Prudential's denial of plaintiff's application. *See, e.g., Carparts Distrib. Center, Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.,* 37 F.3d 12, 19–20 (1st Cir.1994) (finding that limiting the application of Title III to "physical structures which persons must enter to obtain goods and services would run afoul of the purposes of the ADA and would severely frustrate Congress's intent"); *Doukas v. Metropolitan Life Ins. Co.,* 950 F.Supp. 422, 427 (D.N.H. 1996) (extending Title III to insurer's denial of applicant for mortgage disability policy).

2.

■ This conclusion alone does not enable plaintiff to survive summary judgment. He must also wrestle with the safe harbor granted to insurers in § 501(c), which generally exempts risk "underwriting . . ., classifying . . ., and administering" from Title III's reach. 42 U.S.C. § 12201(c). Nonetheless, the language and the legislative history of the statute makes clear that Congress did not intend for § 501(c) to confer blanket

---

1. More likely, the question does not amount to one of "standing" or any related issue of justiciability, as Prudential contends, but rather a question of whether plaintiff has stated a claim upon which relief can be granted.

2. Congress uses this same language repeatedly throughout the statute, further suggesting the importance of considering each noun in the series. *See, e.g.,* 42 U.S.C. § 12182(a) (prohibiting discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations").

immunity on insurers in every insurance-related decision.

The plain text of § 501(c) leaves insurance companies vulnerable in two ways. First, the statute exempts only those underwriting, classification, and administration decisions "that are based on or not inconsistent with State law." 42 U.S.C. § 12201(c)(1). Thus, actions inconsistent state law, such as the Unruh Act, will lose ADA exemption. In this way, plaintiff's claims appear closely linked; prevailing on the state claim subjects Prudential's actions to closer ADA scrutiny.[3] A second way for plaintiff to pierce Prudential's § 12201(c) protection comes from the last line of that subsection, which provides "[p]aragraphs (1), (2), and (3) [containing exemptions for insurance companies, hospitals, HMO's, employers, and ERISA plans] shall not be used as a subterfuge to evade the purposes of subchapter[s] I and III of this chapter." (Footnote omitted.)

The legislative history supports this narrow reading of the § 501(c) exemption. For instance, one House Report stated that the "ADA requires that underwriting and classification of risks be based on sound actuarial principles or be related to actual or reasonably anticipated experience." H.R.Rep. No. 485, pt. 3 at 71 (1990), *reprinted in* 1990 U.S.C.C.A.N. at 267, 303, 494. This implies that where underwriting lacks such a basis, it fails to comply with the ADA.

Plaintiff thus must show a dispute of material fact as to whether Prudential has violated state law. After conceding that Prudential has not violated the California Insurance Code (*see* Pl.'s Opp'n at 4), plaintiff has only a potential Unruh Act violation to support him. The Unruh Act provides in part that "[a]ll persons ... no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever...." Cal. Civ.Code § 51. The law does not afford relief, however, where a business practice "is applicable alike to persons of every sex; color, race, religion, ancestry, national origin, or disability." *Id.* In light of this provision, and in light of the standards applied by California courts, Prudential does not appear to have directly violated the Unruh Act.

In *Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 278 Cal.Rptr. 614, 805 P.2d 873 (1991), the California Supreme Court held that a landlord could impose an income requirement on all prospective tenants without running afoul of the Unruh Act. The *Harris* Court limited Unruh Act claims to those classes of people specifically listed in the statute, or to other persons who allege discrimination based on their "personal characteristics," as opposed to mere "financial or economic ones." *Id.* at 1161, 278 Cal.Rptr. at 624–25, 805 P.2d at 883–84. The Court also found that the landlord applied the financial criteria in a uniform and neutral manner, and that the landlord's legitimate business interest justified the distinctions made on the basis of the applicants' financial status. *Id.* at 1169, 278 Cal.Rptr. at 630, 805 P.2d at 889. Finally, the Court repeated earlier holdings that the Unruh Act only requires that business rules or practices be "reasonable" and not result in "arbitrary discrimination." Id. at 1165, 278 Cal.Rptr. at 627, 805 P.2d at 886.

Prudential asserts that its exclusion of applicants who engage in sexual activities with HIV-positive partners is both neutrally applied and rationally related to its legitimate business objectives, as in *Harris*. It is neutral because all persons, regardless of gender or sexual orientation, are excluded if they engage in sex with an HIV-positive partner. It is rational because, in Prudential's view, it cannot profitably underwrite the uncertain and high mortality risks accompanying such activities. Thus, *Harris* should bar plaintiff's claim.

Plaintiff distinguishes *Harris* on the basis that the *Harris* plaintiffs were not persons in a protected class, and that fact proved critical in the court's decision in that case. *See*

---

**3.** The Unruh Civil Rights Act does provide that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 ... shall also constitute a violation of this section." Cal. Civ.Code § 51. Although this provision means that any ADA violation constitutes an Unruh Act violation, it would be illogical to combine § 12201(c)(1) with the revised § 51 to allow plaintiffs to bootstrap their way to an ADA claim by asserting a nonexistent Unruh Act violation.

*id.* at 1169, 278 Cal.Rptr. at 630, 805 P.2d at 889. In this case, plaintiff seeks to characterize his status as a partner of an HIV-positive individual as a "personal characteristic" under *Harris*.

■■■ As Prudential notes, however, the Unruh Act does not prohibit discrimination based on one's marital or partner status. See *Beaty v. Truck Ins. Exch.*, 6 Cal.App.4th 1455, 8 Cal.Rptr.2d 593 (1992) (finding that refusal to issue unmarried homosexual couple a joint policy did not violate Unruh Act, where insurer uniformly rejected all unmarried applicants, homosexual or not). Prudential further argues that it did not deny plaintiff's application based on his *status,* but rather on his risky *conduct,* that is, having sexual relations with an HIV-infected individual. The Unruh Act does not prohibit discrimination against persons based upon their conduct, but only prohibits that discrimination resulting from the individual's membership in a particular class of persons.[4] *See Gayer v. Polk Gulch, Inc.*, 231 Cal.App.3d 515, 282 Cal.Rptr. 556, 562 (1991) (finding that plaintiff, who had earlier filed a discrimination suit against a bar, could not bring a § 51 action against it because of the bar's refusal to serve him, where subsequent acts of discrimination merely responded to plaintiff's conduct in filing suit).

### 3.

With state law avenues blocked, plaintiff can alternatively argue that Prudential's reliance on § 501(c) constitutes a "subterfuge" to avoid the antidiscrimination provisions of the ADA. Defining what constitutes a "subterfuge" obviously raises difficult questions, particularly in light of the paucity of case law on the matter. The legislative history, however, suggests the propriety of a broad definition of the term. In supporting the bill,

senior members of the House and Senate Judiciary Committees have noted that "subterfuge" does not imply that a court must find "malicious intent" on the part of the insurer to make the latter liable under the ADA. 136 Cong. Rec. H4624 (daily ed. May 17, 1990) (statement of Rep. Edwards); 136 Cong. Rec. § 9697 (daily ed. July 13, 1990) (statement of Sen. Kennedy).[5] House drafters simply intended the subterfuge provision to assure that an insurer's "refusal, limitation [of coverage], or rate differential is based on sound actuarial principles, or is related to actual or reasonably anticipated experience." H.R.Rep. No. 485, pt. 3 at 70, *reprinted in* 1990 U.S.C.C.A.N. 267, 493. Interpreting the entire subsection § 501(c), the House conferees intended to require that "the standards used [in underwriting be] based on sound actuarial data and not on speculation." *Id.; see also id.* pt. 2 at 138, 1990 U.S.C.C.A.N. at 421 (requiring insurers undertake risk underwriting "in accordance with accepted principles of insurance risk classification").

■■ Borrowing from this language, the Court can fashion a legal standard by which to evaluate the facts of this case: insurers retain their § 501(c) exemption so long as their underwriting decisions are in accord with either (a) sound actuarial principles, or (b) actual or reasonably anticipated experience.

Prudential alleges that it bases its underwriting practices on "medical principles establishing that, as a group, these individuals [who engage in sex with HIV-positive partners] present a greater risk of becoming infected with HIV ... than does a group where neither sexual partner is HIV-positive." (Grigg Decl. ¶ 7; *see also* Bennett Decl. ¶ 4.) Assuming that Prudential rejected plaintiff's policy application on this basis

---

4. While this argument may avail Prudential in the Unruh Act context, it does not do so in the context of the ADA, because the ADA explicitly protects persons having "a relationship or association" with a person with a disability. 42 U.S.C. § 12182(b)(1)(E). Because virtually any association or relationship requires conduct of some kind, i.e., payment of membership dues, participation in meetings, etc., characterizing plaintiff's relationship with his mate as "conduct"

does not remove him from protected status under the ADA.

5. Senator Kennedy and Representative Edwards also emphasized that an insurer does not escape liability simply because it instituted its policy prior to the ADA's passage. 136 Cong. Rec. § 9697 (daily ed. July 13, 1990) (statement of Sen. Kennedy); 136 Cong. Rec. H4624 (daily ed. May 17, 1990) (statement of Rep. Edwards).

alone—as the Court must in the absence of any additional evidence—Prudential views the issue too narrowly. The mere fact that a particular individual presents a greater risk does not compel the conclusion that the individual presents an uninsurable risk. Common sense suggests that an insurer that confronts a heterogenous pool of applicants merely consults actuarial tables to adjust its rates to account for varying levels of risk presented by those applicants. Indeed, Prudential's practices typically conform with this logic, as the company admits that it charges about 10 percent of its applicants a premium commensurate with the additional risk that those applicants bring to its pool. (Grigg Decl. ¶ 5.) Yet Prudential offers no actuarial or other data to justify its outright rejection of plaintiff's policy application. As one court noted in a case involving an insurer's rejection of an AIDS-afflicted plaintiff in the group life insurance context:

> [T]he ADA explicitly allows some disability-based distinctions within insurance policies to be drawn by insurers. However, total denial of ... coverage to an individual does not implicate risks. In other words, disability-based distinctions are only relevant when some coverage is extended to an individual with disabilities. No actuarial risk makes someone uninsurable.

*Anderson v. Gus Mayer Boston Store*, 924 F.Supp. 763, 779 (E.D.Tex.1996) (footnote omitted). Although the instant dispute involves the refusal to issue individual coverage, as opposed to the extension of group coverage to an individual, *Anderson*'s logic applies with equal force here.

More important, Prudential does not point to any specific evidence to support this assertion. It argues that it need not offer specific actuarial data to support its decision where it seems so obviously supported by "accepted medical principles" and common knowledge about AIDS and its associated mortality

risks.[6] (Def.'s Reply at 6, n. 4.) The Court disagrees. Though Prudential can meet its initial burden as a Rule 56 movant without presenting evidence that negates plaintiff's claim, *see Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53, plaintiff has demonstrated the existence of a material dispute as to whether Prudential based its decision upon sound actuarial principles or reasonably anticipated experience. In response to plaintiff's showing, Prudential must point to data, studies, or other information relevant to its risk assessment in order to establish the absence of a dispute of material fact.

Specifically, plaintiff discharged his burden by pointing to deposition testimony from Prudential underwriters who "admitted that they either did not recall seeking or definitely did not seek information outside of their own knowledge regarding HIV. None of them recalled specifics of any special training relating to HIV or its transmission, and only one of them had any medical training." (Pl.'s Opp'n at 11:15–21; *see* Doskow Decl., Exs. B, C, D, E.) Plaintiff further asserts that none of the key Prudential employees "consulted medical literature, epidemiological experts, or even in-house actuaries," in deciding to reject plaintiff's application. (Pl.'s Opp'n at 4:1–2.) Plaintiff also points to the declaration of Harry Woodman, a former Chief Underwriter at New York Life, with forty-six years of underwriting experience. Woodman alleges that "in order to make a decision based on sound actuarial reasoning and on a legitimate basis, Prudential should have evaluated [plaintiff's] actual risk of contracting HIV before making a final decision on his application." (Woodman Decl. ¶ 3.) Woodman concludes that he would have offered plaintiff an insurance policy had he been confronted with the same application. (*Id.* ¶ 10.)

Not only does the evidence suggest that Prudential did not base its decision on sound actuarial data, but the rejection of his appli-

---

**6.** Admittedly, Prudential did note that plaintiff's case presents a risk that is "infrequently encountered in the underwriting process." (Spessard Decl. ¶ 5.) This suggests that conventional actuarial data may not be available for plaintiff's application. Even assuming this to be true, Prudential does not point to any epidemiological or other medical evidence relied upon by any member of its Medical Department to justify its rejection of plaintiff's application. In a nation with hundreds of thousands of HIV-positive citizens, clearly Prudential could find studies of some kind on the disease.

cation may not have accorded with reasonably anticipated experience. Prudential's review of plaintiff's medical records could only have revealed that plaintiff engaged in "safe sex"—that is, protected sex—with an HIV-positive partner. Plaintiff's blood test results remained HIV-negative. Despite that fact, Prudential does not offer any evidence that one has a heightened risk, let alone a uninsurable risk, of contracting HIV by engaging in protected sex. Persons such as plaintiff, who took the initiative to report the nature of his sexual activity to his doctor, could conceivably have a *lower* likelihood of contracting the virus than someone who does not regularly see a doctor, does not seek medical advice, and does not purport to take precautions before engaging in sexual activity.

Of course, plaintiff could become infected with the HIV virus in spite of his apparent precautions. In Prudential's most specific allegation on the topic, its Director of Medical Services, Dr. Amy Bennett, states that "[b]ecause the HIV retrovirus becomes incorporated into the genome of the host's immune cells, it is extremely difficult to develop antiviral chemotherapeutic agents or vaccines to eradicate the disease." (Bennett Decl. ¶ 3.) But the medical profession need not eradicate the disease to enable HIV-infected persons to enjoy a life of a reasonably lengthy duration. As Woodman notes, the recent development of antiviral drugs and other medications have enabled persons who contract the HIV virus to live another twenty-five years after exposure. (Woodman Decl. ¶ 6.) In particular, the recent use of protease inhibitors in combination with other antiviral treatments has reduced the presence of the HIV virus to undetectable levels in some patients. See Christine Gorman, "A New Attack on AIDS Multidrug Therapy Seems to Offer the Best Hope so Far of Beating Back the Deadly Virus," Time, Vol. 148, No. 3, July 8, 1996 at 52.

If one can live many years after infection, such persons as plaintiff hardly present uninsurable risks for a life insurance company. New York Life's decision to issue plaintiff two individual policies in 1996, in spite of New York Life's full knowledge of plaintiff's sexual activities, bolsters this conclusion.

In light of the conflicting evidence, Prudential can only prevail if it provides the Court with facts sufficiently specific to convince the Court of an absence of disputed fact. The Court does not stand alone in demanding such a showing, as revealed by other courts that have addressed the question in the context of HIV-infected insurance applicants. *Anderson,* 924 F.Supp. at 779, and *Piquard v. City of East Peoria,* 887 F.Supp. 1106, 1125–26 (C.D.Ill.1995). In *Anderson,* the court ruled against the defendant where its insurer "made no claim that it has conducted any ... studies." In the context of an employer-sponsored group benefit plan, the court further opined that the ADA "puts the burden on those actors classifying risks to show both their rationality and permissibility." In *Piquard,* also a benefit plan case, the court required that an employer or the employer's insurer bear the burden of providing "risk assessment and actuarial data" to prevail on summary judgment. *Id.* at 1126. Although the court declined to reach the question of whether the "subterfuge" provision of the larger § 501(c) required a similar showing, the reasoning appears equally compelling in either context:

> The EEOC explains [in its Interim Policy] that requiring the defendant to bear the burden of proof is consistent with the principle that the burden of proof should rest with the party who has the greatest access to the relevant facts. In the health insurance context, the defendant ... has control of the risk assessment, actuarial, and/or claims data relied upon in adopting the challenged disability-based distinction. The plaintiff has no access to such data.

*Id.* at 1127 (citing *Public Employees Retirement Sys. v. Betts,* 492 U.S. 158, 181, 109 S.Ct. 2854, 2868–69, 106 L.Ed.2d 134 (1989)).

Applicable regulations also support the imposition of a burden to provide data on the ADA defendant. The Department of Justice does not require insurance companies to include actuarial data with every rejection of an application because that "information would presumably be obtainable in a court proceeding where the insurer's actuarial data

was the basis for different treatment of persons with disabilities." 29 C.F.R. Ch. I, Pt. 36, App. B, § 36.212 (1996). The passage continues, "[b]ecause the legislative history of the ADA clarifies that different treatment of individuals with disabilities in insurance may be justified by sound actuarial data, *such actuarial data will be critical to any potential litigation on this issue." Id.* (emphasis added).

It defies the spirit of the ADA for the Court to accept Prudential's proffer of vague explanations of the risks of HIV infection where the business of insurance requires sound risk assessment practices. Because plaintiff has pointed to evidence revealing the possibility of discriminatory denial of an insurance policy, Prudential can only prevail on summary judgment by coming forward with actuarial or other data supporting its actions.

### C.

■ Plaintiff also brings a claim for discrimination under the Unruh Act. Although the Court has already concluded that plaintiff cannot show how Prudential has directly violated the Unruh Act, there appears to exist a "federal-law back door" to § 51 liability. That is, the California legislature amended the Unruh Act in 1992 to provide that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 ... shall also constitute a violation of this section." Cal. Civ.Code § 51. Because the Court denies Prudential's motion for summary judgment as to the ADA claim, it must deny the motion as to the Unruh Act claim as well.

### III.

Accordingly,

IT IS HEREBY ORDERED that:

1. Defendant's motion for summary judgment on plaintiff's claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of California Insurance Code § 10140 is GRANTED.

2. Defendant's motion for summary judgment of plaintiff's claims under the ADA and the Unruh Act is DENIED.