Carparts, et al. v. Auto Wholesalers  CV-92-592-M   09/30/97  P

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


<u>Carparts Distribution Center, Inc.,</u>
<u>Daniel Drish and Shirley M. Senter,</u>
<u>Co-Executors of the Estate of</u>
<u>Randy J. Senter, and the Equal</u>
<u>Employment Opportunity Commission</u>,

    Plaintiffs

    v.                                       Civil No. C-92-592-M

<u>Automotive Wholesaler's Ass'n</u>
<u>of New England, Inc., and</u>
<u>Automotive Wholesaler's Ass'n</u>
<u>of New England, Inc. Insurance Plan</u>.

    Defendants




**O R D E R**


Plaintiffs bring this action pursuant to Titles I and III of the Americans with Disabilities Act of 1990, Title I of the Civil Rights Act of 1991, and 42 U.S.C. § 1985(3), seeking damages for alleged acts of unlawful discrimination in the administration of certain health insurance benefits claimed by the Estate of Randy Senter.  The complaint also alleges several statutory and common law causes of action under the law of the State of New Hampshire. Pending before the court are plaintiffs' motion for summary judgment on their claims under Title I of the ADA and defendants' motion for summary judgment as to all of plaintiffs' claims.


**Factual Background**

Prior to his death, Randy Senter was the sole shareholder, president, and an employee of Carparts Distribution Center, Inc., an automotive parts wholesaler located in Plaistow, New Hampshire. In May of 1986, Senter learned that he was infected with the Human Immunodeficiency Virus ("HIV"). Approximately five years later, he was diagnosed as suffering from Acquired Immune Deficiency Syndrome ("AIDS"). He died on January 17, 1993.

In 1977, Carparts became a participant in a self-funded medical cost reimbursement plan known as Automotive Wholesaler's Association of New England Health Benefit Plan (the "Plan"), which was offered by defendants Automotive Wholesaler's Association of New England, Inc. ("AWANE") and its administering trust, Automotive Wholesaler's Association of New England, Inc. Insurance Plan (the "Trust"). As an employee of Carparts, Senter enrolled in the Plan in 1977, which, at the time, provided lifetime medical insurance benefits in the amount of $1,000,000 per eligible member. In January of 1991, however, defendants instituted a $25,000 cap on lifetime benefits for AIDS-related illnesses. Plaintiffs claim that defendants instituted the cap with knowledge that Senter was HIV positive, suffering from AIDS, and incurring AIDS-related medical expenses. Defendants deny any

2

knowledge of Senter's illness prior to implementation of the cap. They also deny that their conduct is prohibited by the ADA.

In 1993, this court (Loughlin, J.) dismissed plaintiffs' complaint, concluding that the ADA does not apply to this case because defendants were neither Senter's "employers" under Title I nor were they "public accommodations" under Title III.[1] The court also concluded that plaintiffs "failed to identify a source of congressional power other than the Americans with Disabilities Act so as to reach the private conspiracy alleged by plaintiffs." Finally, the court dismissed plaintiff's state law claims as preempted by the provisions of ERISA. Carparts Distribution Center, Inc. v. Automotive Wholesaler's Ass'n of New England, Inc., No. C-92-592-L, slip op. (D.N.H. July 19, 1993) ("Carparts I").

On appeal, the Court of Appeals for the First Circuit held that Judge Loughlin had interpreted the provisions of Title I and Title III of the ADA too narrowly and erred in dismissing

---

This case presents a somewhat unusual situation insofar as Carparts, Senter's employer, is a plaintiff, rather than a defendant. Apparently, when the Plan refused to reimburse Senter for certain AIDS-related medical treatment, Carparts paid for some of his medical expenses. Accordingly, Carparts, like Senter's estate, claims to have suffered damages as a result of defendants' allegedly wrongful conduct.

3

plaintiffs' complaint.  With regard to Title I of the ADA, the court of appeals observed that "defendants could be considered Senter's 'employers,' and therefore subject to liability under Title I, under any one of at least three theories."  Carparts Distribution Center, Inc., v. Automotive Wholesaler's Ass'n of New England, Inc., 37 F.3d 12, 14 (1st Cir. 1994) ("Carparts II").  With regard to Title III of the ADA, the court concluded that "public accommodations" are not limited to physical structures.  Id. at 19.  Accordingly, the appellate court reasoned that Title III of the ADA may well prohibit self-insured group health benefit plans from discriminating against protected individuals with regard to the content of the goods and/or services they provide.

The court of appeals then remanded the case with instructions to reconsider plaintiffs' claims in light of its opinion.  Upon Judge Loughlin's retirement, the case was reassigned to this judge.

**Discussion**

I.  <u>Jurisdiction Over Plaintiffs' Title I Claims</u>.

At this juncture, the existence of unresolved factual issues (and undeveloped legal arguments), preclude the court from

4

determining whether it has jurisdiction over plaintiffs' Title I claims. Although alluded to in the parties' papers, the following issue remains largely unaddressed: Provided defendants may, under the tests articulated by the court of appeals in Carparts II, properly be deemed to be Senter's "employer" for purposes of the ADA (which seems likely), did that "employer" have "25 or more employees for each working day in each of 20 or more calendar weeks." 42 U.S.C. § 1211(5). Obviously, that question raises another: Whether this court should count the number of individuals employed by the plaintiff, Carparts (Senter's actual employer, which appears to have employed more than 25 individuals), or the number employed by defendants, AWANE and/or the Trust (Senter's constructive "employers" for purposes of Title I, neither of which appears to have employed 25 or more individuals).

Resolution of that question (which turns on not only legal issues, but factual ones as well) will obviously determine whether Title I of the ADA properly governs defendants' conduct in this case and whether the court has jurisdiction over plaintiffs' Title I claims. Accordingly, on or before November 14, 1997, the parties shall file memoranda addressing that issue, providing appropriate citation to any relevant legal authority

5

(binding or persuasive).  Additionally, the parties shall brief the following legal and factual questions:

1.      If the court determines that defendants are properly deemed to have acted as Senter's "employer" because they "exercised control over an important aspect of his employment," Carparts II, at 17, must defendants have employed the statutory minimum number of employees during the relevant period of time in order for the court to exercise jurisdiction over plaintiffs' Title I claims? See, e.g., United States v. State of Illinois, 3 A.D. Cases 1157, 1994 WL 562180 (N.D. Ill. 1994) (holding that the administrator of a pension fund was subject to the provisions of Title I of the ADA (without directly addressing the allegation that it employed fewer than 15 employees) because it had "the power to significantly affect access to employee benefits which are a portion of a police officer's or firefighter's compensation.").

2.      If the court determines that defendants are properly deemed to have acted as Senter's employer  because they were "'agents' of a 'covered entity', who act[ed] on behalf of the entity in the matter of providing and administering health benefits," Carparts II, at 17, must defendants have employed the statutory minimum number of employees during the relevant period of time in order for the court to exercise jurisdiction over plaintiffs' Title I claims? See, e.g., DeVito v. Chicago Park District, 83 F.3d 878, 882 (7th Cir. 1996) ("[a]gents [of employers] are liable under the ADA only if they otherwise meet the statutory definition of an employer.  For example, an agent of an employer is not liable under the ADA unless it has the requisite number of employees and is engaged in an industry affecting

6

commerce.") (citation and internal quotation marks omitted).

3.      When determining the number of individuals employed by defendants, is it appropriate for the court to include in its count those individuals employed by Carparts as well as defendants, pursuant to the "single employer" or "joint employer" or "integrated enterprise" doctrine?

4.      When determining the number of individuals employed by defendants, is it appropriate for the court to include in its count those individuals employed by entities closely associated with AWANE and/or the Trust (but not named as defendants), pursuant to the "single employer" or "joint employer" or "integrated enterprise" doctrine?

5.      How many individuals did each of the entities referenced above actually employ during the time at issue in this case?[2]

II.   Plaintiffs' Title III Claims.

In Carparts II, the court of appeals held that establishments of "public accommodation" are not limited to actual physical structures and suggested that "plaintiff may be

---

The court acknowledges that the EEOC has briefed some of the issues specified above (i.e., the integrated enterprise theory). It has also represented that United States v. Illinois, supra, is the only published opinion it has uncovered which addresses the first of the four issues specifically listed above. The other issues identified by the court, however, remain largely unaddressed. If the EEOC and/or the remaining plaintiffs are satisfied that the EEOC's discussion of the issues it has briefed is thorough and adequately addresses all pertinent authorities, they need not supplement their prior submissions as to those issues.

7

able to develop some kind of claim under Title III." Carparts II, at 20. It then remanded this case, with instructions to afford plaintiffs the opportunity to present further evidence supporting their view that defendants qualify as places of public accommodation within the meaning of Title III of the ADA.

While there are no doubt sound policy reasons which support the appellate court's broad construction of the phrase "public accommodation," reconciling that broad construction with the Federal Regulations implementing the ADA requires some effort.[3] Indeed, there appears to be disagreement among the circuits as to the scope of Title III's reach and the proper interpretation of the phrase "public accommodation." See, e.g., Parker v. Metropolitan Life Insurance Co., ___ F.3d ___, 1997 WL 431851 (6th Cir. 1997) (en banc) (reversing an earlier panel decision and holding that "[t]he clear connotation of the words in § 12181(7) is that a public accommodation is a physical place. . .

---

28 C.F.R. § 36.104 defines a public accommodation as "a facility, operated by a private entity, whose operations affect commerce." That regulation then defines a "facility" as:

> all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located.

8

To interpret these terms as permitting a place of accommodation to constitute something other than a physical place is to ignore the text of the statute and the principle of noscitur a sociis").

Nevertheless, consistent with our court of appeals' holding in Carparts II, this court must accept that there are circumstances under which a "public accommodation" might be something other than a physical structure or other real or personal property. The relevant inquiry, then, is whether defendants are such public accommodations.

Having been provided with an opportunity to demonstrate that defendants are places of "public accommodation," plaintiffs have taken the view that resolution of that issue requires a trial. Defendants, on the other hand, continue to assert that they are not public accommodations and are, therefore, entitled to judgment as a matter of law with regard to plaintiffs' Title III claims. They have, however, failed to carry their burden of proof.

In support of their claimed entitlement to summary judgment, defendants merely state:

9

> Defendants respectfully continue to contend that the remedial intent of the ADA cannot serve to alter the plain language employed by the drafters, whose definition of "public accommodation" did not just give examples, but purported to list each such accommodation, and in so doing does not include any entry even approaching the likeness of a health insurance plan.

Defendants' Memorandum in Support of Summary Judgment (document no. 40) at 23. At this juncture, particularly in light of the appellate opinion in Carparts II, defendants must provide more than merely a conclusory statement asserting disagreement with the view adopted by the court of appeals. Based upon their submissions to date, defendants have failed to demonstrate the absence of any genuine issue of material fact related to whether they are "public accommodations" under Title III. Nor have they demonstrated that they are entitled to judgment as a matter of law (either because Title III does not apply to them or because their conduct was not prohibited by Title III).

## III. Discrimination Under the ADA.

Even assuming that defendants may properly be treated as Senter's "employer" for purposes of Title I, and as "public accommodations" for purposes of Title III, the existence of genuine issues of material fact precludes the entry of summary judgment in favor of either plaintiffs or defendants. In short,

10

neither party has demonstrated an entitlement to judgment as a matter of law with regard to the question of whether defendants' conduct was unlawful under the ADA.

Provided that an insurer is otherwise subject to the provisions of the ADA (e.g., as a "public accommodation"), Title IV of the ADA sets forth certain "safe harbor" provisions applicable to those insurers:

> Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict --
>
>> (1) an insurer . . . or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or
>>
>> (2) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or
>>
>> (3) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

42 U.S.C. § 12201(c). As this court (Devine, J.) has previously held, the safe harbor provisions permit those insurers which are

11

subject to the ADA to base insuring decisions upon either actuarial principles or reasonably anticipated experience. Doukas v. Metropolitan Life Insurance Co., 950 F.Supp. 422, 428 (D.N.H. 1996). Accord World Insurance Co. v. Branch, 966 F.Supp. 1203, 1208 (N.D. Ga. 1997) ("insurance practices are protected to the extent they are in accord with sound actuarial principles, reasonably anticipated experience, or bona fide risk classification."); Cloutier v. Prudential Insurance Co., 964 F.Supp. 299, 303 (N.D. Cal. 1997) ("the ADA requires that underwriting and classification of risks be based on sound actuarial principles or be related to actual or reasonably anticipated experience.") (citation and internal quotation marks omitted).

Here, there appears to be no dispute that defendants failed to base the decision to implement the AIDS-related cap upon any actuarial data. In fact, John Healy, the executive director of AWANE, testified at deposition that he was unaware of any such actuarial data when the Trust decided to impose the cap. See Healy deposition at 498. There is, however, a genuinely disputed and material factual issue: Whether defendants based the decision to implement the AIDS-related illness cap upon legitimate, reasonably anticipated claims experience. Plaintiffs argue that

12

defendants acted out of bias and bigotry when they instituted the cap. In support of that claim, they cite the affidavit of David Lodemore, a former employee of Blue Cross/Blue Shield of Massachusetts (which formerly administered some of the benefits for the Plan). Mr. Lodemore's affidavit recounts a meeting between him and Healy, at which Lodemore had the "impression that Mr. Healy was morally opposed homosexuals and believed that AIDS was primarily a homosexual disease. Mr. Healy made clear that he was vehemently opposed to AWANE paying any benefits for members with AIDS because he considered homosexuals to be 'perverts and criminals.'" Lodemore affidavit at para. 5.

In response, defendants claim that they were unaware that Senter was HIV positive or suffering from AIDS when the Trust decided to implement the cap. Healy affidavit at para. 26. Rather than basing their decision to institute the cap on moral judgments or discriminatory animus, defendants claim that the decision was reasonably based upon a legitimate perception that AIDS-related claims would create an intolerable and unsustainable financial drain upon the assets of the Plan and, therefore, posed an unjustifiable insurance risk. They say that the cap was merely an effort to limit and manage that legitimately perceived risk. For example, Healy suggested at his deposition that he was

13

concerned AIDS-related claims might overwhelm the Plan and that, in turn, would render the Plan financially incapable of competing in the marketplace.  Accordingly, he likened the cap on AIDS-related medical reimbursement to similar caps applicable to other illnesses and/or medical services: "We have to be competitive in the marketplace on levels, coverages and costs, and that's the reason why there are caps on mental illness, chiropractors, physical therapy, alcoholism, drug abuse, skilled nursing. . .." Healy deposition at 283.

Ultimately, while the record on this point is not entirely clear (the parties having submitted only excerpts from relevant deposition testimony), the court cannot rule, as a matter of law, that defendants failed to base their decision to implement the cap on reasonably anticipated claims or losses related to reimbursement for AIDS-related medical expenses.  It appears from the record that Healy and/or the trustees of the Plan could have honestly believed, based upon reports in the media and issued by the government and medical experts, that the potentially rapid and devastating spread of HIV in 1990-91 represented a serious medical threat to the population and, in turn, to the medical insurance industry.  What remains unclear is whether those beliefs were "reasonable" and whether defendants' claimed concern

14

for the fiscal health of the Plan was, in fact, legitimate.  On the record presently before the court, that issue cannot be resolved as a matter of law.[4]

At this juncture, defendants' proffered explanation for their decision to implement the AIDS-related reimbursement cap is minimally sufficient to preclude the court from granting plaintiffs' motion for summary judgment.  Conversely, however, because plaintiffs have adduced evidence which, if credited by a trier of fact, could reasonably support the conclusion that defendants acted with an unlawful discriminatory animus and/or upon unreasonable speculation regarding the medical and fiscal threat posed by the Human Immunodeficiency Virus and AIDS, the court also denies defendants' motion for summary judgment.

---

Some of Healy's deposition testimony certainly suggests that the _magnitude_ of his fear concerning the mode and speed at which HIV was infecting the population was unwarranted and unsupported by the then-current state of medical knowledge. While not dispositive of the issue, Healy's testimony certainly lends support to plaintiffs' claim that the cap was, at least in part, based upon irrational fear and impermissible speculation.

II. Plaintiffs' State Law Claims.

Defendants also move for summary judgment with regard to plaintiffs' state law claims, asserting that those claims are either preempted by ERISA or fail to state viable causes of action. Plaintiffs object.

A. Claims Under N.H. Rev. Stat. Ann. ch. 354-A.

As this court (Devine, J.) has previously held, N.H. Rev. Stat. Ann. ("RSA") ch. 354-A "does not create a private right of action for individuals aggrieved by unlawful discrimination." Evans v. Work Opportunities Unlimited, Inc., 927 F.Supp. 554, 556 (D.N.H. 1996). Accord Tsetseranos v. Tech Prototype, Inc., 893 F.Supp. 109, 119-20 (D.N.H. 1995). Accordingly, defendants' motion for summary judgment with regard to plaintiffs' claims under RSA 354-A is granted.

B. Plaintiffs' Remaining State Law Claims.

Defendants assert that plaintiffs' remaining state common law and statutory claims are preempted by the provisions of ERISA. In response, plaintiffs deny that ERISA either governs or preempts their claims. They assert that Senter, as the sole shareholder of Carparts, was (like Carparts itself) an "employer" rather than an "employee," as those terms are defined by ERISA.

16

Plaintiffs also argue that neither Carparts nor Senter was a beneficiary or participant in an ERISA-governed employee benefit plan and, therefore, do not have standing to raise an ERISA-based claim against defendants. Accordingly, they conclude that their state law claims against defendants are not preempted by ERISA. See generally, Taylor v. Carter, 948 F.Supp. 1290 (W.D. Tex. 1996) (collecting cases and discussing the three distinct means by which courts have resolved whether an individual is an "employer" or an "employee" under ERISA and whether that individual has standing to bring claims under ERISA). See also Kwatcher v. Mass. Service Emp. Pension Fund, 879 F.2d 957 (1st Cir. 1989) (holding that the sole shareholder and employee of a corporation was an "employer" under ERISA and, therefore, ineligible to participate in an ERISA-qualified pension plan).

In short, plaintiffs say that: (1) Carparts and Senter are "employers" under ERISA, (2) as employers, they lack standing to raise ERISA-based claims, and, therefore, (3) their state law causes of action are not preempted by ERISA. Defendants have failed to address those legal and factual claims. Instead, they merely rely upon traditional arguments that an employee's state law claims against an ERISA plan or ERISA plan administrator are preempted by ERISA. Consequently, defendants have demonstrated

17

neither a lack of genuine issues of material fact nor an entitlement to judgment as a matter of law with regard to the preemption issue. While the court may ultimately conclude that plaintiffs' state law claims are preempted by ERISA, the record as presently developed does not support such a ruling.

Defendants are, of course, free to renew their motion for summary judgment with regard to plaintiffs' state law claims. If they elect to do so, however, they should: (1) address in detail plaintiffs' legal argument that ERISA does not preempt state law claims raised by employers against ERISA plans or plan administrators; and (2) either demonstrate that plaintiffs' legal analysis of that issue is flawed or demonstrate that Senter was an "employee," rather than an "employer," under the provisions of ERISA.

The legal and factual issues raised in this case are, of course, complex. The court will not base its rulings upon an inadequately developed factual record, nor is it inclined to engage in extensive legal research and analysis, which should, initially, be performed by the parties.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment (document no. 40) is granted with regard to plaintiffs' claims under RSA 354-A.  Otherwise, that motion is denied. Plaintiffs' motions for summary judgment (documents no. 38 and 39) are likewise denied.


On or before November 14, 1997, the parties shall submit their legal memoranda addressing the Title I jurisdictional questions raised by the court.


**SO ORDERED.**


_____
Steven J. McAuliffe
United States District Judge

September 30, 1997

cc:   James Q. Shirley, Esq.
      Paul R. Cox, Esq.
      Elizabeth Grossman, Esq.